379 So.2d 240 (1979)
STATE of Louisiana
v.
Dalton PREJEAN.
No. 64813.
Supreme Court of Louisiana.
November 29, 1979.
Concurring Opinion January 28, 1980.
Dissenting Opinion on Denial of Rehearing January 28, 1980.
*241 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., for plaintiff-appellee.
Thomas E. Guilbeau, Lafayette, for defendant-appellant.
DIXON, Justice.[*]
At about five o'clock in the morning of July 2, 1977 the defendant, his brother Joseph, Michael George and Michael Broussard left Roger's Nite Club in Lafayette Parish. The four had spent the night drinking in various lounges in the vicinity. *242 They left Roger's Nite Club in a 1966 Chevrolet driven by the defendant, with his brother in the front seat and the other two in the back. The car's taillights were not working, and within a few hundred feet of the lounge, State Trooper Donald Cleveland, who was on his way to work driving his police vehicle, signaled the Chevrolet to stop. The defendant and his brother attempted to switch places in the front seat because the defendant had been driving without a license. The officer noticed the switch and ordered the occupants out of the car. He told Michael George and Michael Broussard to get back in, however, and began to search Joseph Prejean. Dalton Prejean, back in the car, stated, "I don't like the way he's doing my brother." (This was a reaction to the trooper's pushing Joseph against the car, over Joseph's protest). Defendant then took a .38 caliber revolver from under the car seat, got out of the car and approached the officer with the gun hidden against his leg. As he neared the trooper he fired without warning. Trooper Cleveland was struck by two bullets and was killed. The defendant and his companions fled the scene but were apprehended several hours later.
Dalton Prejean was charged by grand jury indictment with first degree murder in violation of R.S. 14:30. The trial was transferred from Lafayette Parish to Ouachita Parish because of pretrial publicity. After a three day bifurcated trial beginning on May 1, 1978 a jury of twelve persons found the defendant guilty as charged and unanimously recommended that the death penalty be imposed. The defendant now appeals the verdict and sentence, relying on eleven assignments of error.
Assignments of Error Nos. 1 and 2
In his first assignment the defendant urges as error the challenges for cause granted by the court against jurors voicing an inability to impose the death penalty. By his second assignment the defendant contends that his counsel at trial was incompetent and erred in not objecting to the challenges for cause and in failing to traverse the testimony of witnesses that they would not vote for the death penalty.
C.Cr.P. 798(2) provides:
"It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt."
In Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that a sentence of death cannot be carried out if the jury that recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. The defendant asserts that the exclusion of prospective juror Ertha Taylor was contrary to the standard of Witherspoon.
The prospective jurors were examined in panels. Twelve were selected for the initial panel and new jurors were led in to replace those excluded during the voir dire. The jurors were asked to raise their hands in response to questions asked of them. In response to an inquiry by the prosecuting attorney as to whether any of the jurors had scruples against capital punishment to the point where he would under no circumstances be able to impose that penalty, even if it were justified by the facts, Ms. Taylor raised her hand. Ms. Taylor further stated, "I don't believe I could do it." The prosecutor responded, "Not at all?" to which Ms. Taylor answered, "No sir." The counsel for the defendant was asked if he wished to traverse, but he declined to do so.
No objection was made to the challenge for cause of Ms. Taylor. In the *243 absence of a contemporaneous objection, an alleged error or irregularity in the proceedings cannot be availed of by the defendant after the verdict is rendered. C.Cr.P. 841; State v. Mitchell, 356 So.2d 974 (La.1978); State v. Williams, 343 So.2d 1026 (La.1977). In any event the record indicates clearly that Ms. Taylor was properly excused for cause. Ms. Taylor did more than voice a general objection or conscientious or religious scruples against the death penalty. She stated her honest opinion that she could under no circumstances impose that penalty. Therefore, she was properly excused under C.Cr.P. 798(2) and Witherspoon.
The defendant in brief asserts that the defense counsel's failure to object to the exclusion of Ms. Taylor amounted to ineffective and incompetent assistance of counsel. This contention is without merit. The record indicates that defense counsel was experienced in the practice of criminal law. As noted above, the exclusion of Ms. Taylor was proper. Trial counsel cannot be said to be incompetent for failing to object to what was not objectionable. Nor does counsel's failure to traverse or seek to rehabilitate the excluded witness amount to incompetence. When asked if he wished to question the nine prospective jurors excluded under C.Cr.P. 798(2), defense counsel typically replied that he was in complete agreement with the sentiments expressed by the excluded jurors. In all other respects his voir dire was competent and able. The defense counsel apparently chose to forego rehabilitation of the excluded jurors in the hope of impressing upon the remaining jurors the moral scruples some members of society have against imposition of the death penalty. The purpose of post-trial review of the effectiveness of counsel is not to second guess the tactical decisions of trial counsel.
These assignments are without merit.
Assignments of Error Nos. 3 and 4
By these assignments the defendant, who is black, urges error in the denial of his motion to quash the petit jury panel on the grounds that the prosecutor deliberately exercised his peremptory challenges so as to exclude members of the defendant's race from the petit jury. Defendant also assigns error in the trial court's denial of a continuance to permit him to gather information to establish an historical pattern of discrimination.
Immediately after the selection of twelve white jurors, the defendant moved to quash the panel. He contended four out of the nine peremptory challenges exercised by the state were against blacks. Arguments were made on the motion the following morning, at which time the defendant's counsel stated that the records as to persons challenged by the prosecuting attorney were in Lafayette Parish, and, therefore, the only evidence he had to support his motion was the fact that the state had exercised four of its nine peremptory challenges against blacks. The defendant asked to introduce evidence from those records at a later date. The court stated that it could not simply leave the door open for the defendant to introduce that evidence at any time. The trial court then denied the motion to quash the petit jury panel. The defendant did not urge discrimination in the use of the state's peremptory challenges in his motion for a new trial, in which he could have introduced any evidence obtainable from the Lafayette Parish records.
The excellent per curiam notes of the trial judge discuss the habitual thorough preparation of defense counsel, and that his active criminal practice would have given him knowledge of any racial discrimination by the district attorney. To this the trial judge added that, to his knowledge, there was no systematic exclusion of blacks in the Fifteenth Judicial District, by any means.
As noted in State v. Washington, 375 So.2d 1162 (La.1979) and State v. Brown, 371 So.2d 751 (La.1979), this court has held that a defendant is not denied equal protection by the state's use of peremptory challenges against blacks unless there is a systematic exclusion of blacks over a period of time. In so doing, we adhered to the principle of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), in which the United States Supreme Court held that a showing that peremptory challenges were *244 used to exclude blacks in a particular case did not establish a violation of equal protection under the Fourteenth Amendment of the United States Constitution. Rather, a showing of a systematic exclusion over a period of time is required to present a constitutional issue. In the present case, the defendant introduced no evidence to show that exclusion of blacks by peremptory challenge had occurred over a period of time. Therefore, his motion to quash the petit jury panel was properly denied.
These assignments are without merit.
Assignment of Error No. 5
At the beginning of the trial the prosecutor asked the widow of the victim how many children she had. Defense counsel objected to that question but only after the witness' response was entered in the record. The court ordered the jury removed while argument was made on the defense objection. The court sustained the objection on the grounds that the number of the witness' children was irrelevant. The jury was brought back in and examination of the witness continued.
The defendant now assigns as error the action of the trial court in sustaining the objection. His reasons for doing so are unclear. The argument in the defense brief merely repeats the language of the assignment. The defendant apparently objects to the fact that the court's ruling was made out of the presence of the jury. That fact does not warrant reversal. Defense counsel made the objection only after the question had been answered. The trial court ruled on the objection at the instance of the defendant, and after the defense counsel requested that the jury be removed. Defense counsel made no request that the court repeat its ruling to the jury. Counsel likewise made no objection to the court's failure to do so. The defendant cannot therefore avail himself of any error in the court's ruling out of the presence of the jury.
This assignment is without merit.
Assignment of Error No. 6
By this assignment defendant urges error in the trial court's decision to admit two allegedly gruesome photographs.
During the testimony of State Trooper Tommy Legendre the state sought to introduce into evidence photographs of the victim taken at the scene of the crime. The two 3½" × 5" pictures of the victim show the chest and jaw wounds suffered by the victim, along with a certain amount of blood. The photographs are unpleasant, but are not excessively gruesome. Defense counsel objected to the admission of the photographs, but the trial court overruled the objection.
In State v. George, 346 So.2d 694 at 702-3 (La.1977), this court stated:
"It is well established that the test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Williams, No. 58,679, 343 So.2d 1026 (La.1977); State v. Cooper, 334 So.2d 211 (La.1976); State v. Smith, 327 So.2d 355 (La.1975). Generally, photographs are admissible which illustrate any fact or which shed light on an issue, or are relevant to describe the person, place or thing involved. State v. Hollingsworth, 337 So.2d 461 (La.1976). More particularly, photographs of the body of a deceased victim depicting fatal wounds have generally been held relevant to prove the corpus delicti; to corroborate other evidence of the manner in which death occurred; to establish the location, severity and number of wounds; and to establish the identity of the victim. State v. Cooper, supra; State v. Beach, 320 So.2d 142 (La.1975)."
The photographs in question here are relevant to prove corpus delicti and to show the number and nature of the wounds inflicted on the victim. Since the probative value of the photographs outweighs their prejudicial effect, the trial court did not abuse its discretion in admitting them.
The defendant contends, however, that in light of the stipulation he offered as to the circumstances of the case the pictures had no probative value whatsoever. In State v. Gilmore, 332 So.2d 789 (La.1976), we discussed *245 the proposition that where a defendant stipulated to all the facts to which allegedly gruesome photographs would be relevant, the trial court would act properly in excluding the photographs from evidence. We noted that it would be for the trial court to determine whether the proffered stipulation was so complete as to render the photographs wholly needless, considering the legitimate moral force which photographs may have in favor of the state. See State v. Harvey, 358 So.2d 1224 (La. 1978).
In the present case the stipulation was offered by the defendant far in advance of the state's effort to introduce the photographs, and it was offered for a purpose unrelated to them. In addition, the stipulation fails to give all of the information contained in the pictures. The pictures were relevant to show the number and nature of the wounds. The offered stipulation contained no reverence to those facts. There was no error in the ruling of the trial judge.
Assignment of Error No. 7
The defendant contends that the trial court erred in allowing the state to present evidence out of order in the sentencing phase of the trial.
Following the jury's verdict of guilty, the trial court moved into the sentencing phase. The second witness called by the state, Officer Joseph Cormier of the Lafayette City Police Department, testified, over defense objection, that when arrested the defendant did not appear to be intoxicated. The defendant argues that when the state opens the sentencing phase of the trial, it should be restricted to presenting evidence of aggravating circumstances, and should not be allowed to introduce evidence relating to mitigating circumstances until after the defense attempts to establish that such circumstances exist. That argument, however, is based on a misinterpretation of the Code of Criminal Procedure articles relating to the sentencing hearing.
C.Cr.P. 905.2 provides:
"The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender. The hearing shall be conducted according to the rules of evidence. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at the trial on the issue of guilt. The defendant may testify in his own behalf. In the event of retrial the defendant's testimony shall not be admissible except for purposes of impeachment."
That article clearly states that evidence as to mitigating circumstances shall be relevant. It does not limit the introduction of such evidence to the defense. In addition, during the guilt determination stage of the trial the state had established one aggravating circumstancethe killing of a law enforcement officer engaged in his lawful duties. The defense had sought to show that the defendant had been intoxicated as a defense to the crime charged. Since the jury is authorized by C.Cr.P. 905.2 to consider evidence offered at the trial on the issue of guilt, the issue of whether the defendant was intoxicated was already before the jury. It was therefore proper for the state to offer evidence on that issue when it opened the sentencing phase of the trial.
This assignment lacks merit.
Assignments of Error Nos. 8 and 9
The defendant asserts that the trial erred in refusing to grant his motion for a new trial, based on the alleged failure of juror David Howell to disclose during voir dire his relationship with law enforcement officers. The defendant also claims that the trial court erred in denying him time before sentencing to substantiate his claims.
On voir dire, defense counsel asked Mr. Howell if he "had any friends in law enforcement," and if he had any "ties" to someone in law enforcement. Mr. Howell answered that he did not, and was accepted *246 as a member of the jury at a time when defendant had three peremptory challenges remaining. On May 11, 1978, the day set for sentencing, defense counsel filed a written motion for a new trial, alleging that "it is understood that" Mr. Howell was actually a personal friend of an employee of the Louisiana State Police. Defense counsel claims that, even if that were not grounds to challenge Mr. Howell for cause, he would have exercised one of his remaining peremptory challenges against him. Defense counsel also filed an oral motion for a delay in sentencing to allow him to produce witnesses to substantiate his allegations that Mr. Howell had answered falsely on voir dire. The court was told that a third person, an attorney, had provided defense counsel with the information as to the juror's ties with law enforcement, but that defense counsel had not been able to corroborate the information. The court denied the motion for a delay and the motion for a new trial.
The motion for a new trial was made under C.Cr.P. 851(4) which provides that a new trial shall be granted if the defendant discovers, after the verdict, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of due diligence by the defendant, was not discovered before the verdict. Even if the false testimony of a juror, depriving the defendant of the effective use of his peremptory challenges, is an error or defect cognizable under C.Cr.P. 851, the motion for a new trial was properly denied.[1] The defendant introduced no testimony whatsoever to support his contention that the juror had falsely answered on voir dire. In the absence of such evidence the trial court acted properly in denying the motion.
The defendant asserts, however, that the trial court erred in not allowing a delay for the defendant to seek and produce evidence to support his allegations in the motion for a new trial. C.Cr.P. 853 provides that a trial court, for good cause shown, may postpone imposition of sentence in order to give the defendant time to prepare and file a motion for a new trial.[2] There is considerable question as to whether that article was meant to apply where the motion for a new trial has already been made and the defendant merely seeks time to gather evidence in support of that motion. In any event the defendant did not at the hearing on the motion show good cause for a delay. He did not allege that he had only had a short period of time to prepare his motion. He merely stated that he had not yet been able to corroborate his factual allegations. In addition, there was no showing that the defendant took any measures to bring any witnesses into court to support his motion. The defendant did not offer to produce any witnesses. In short, the defendant failed to show good cause why a delay should have been granted.
These assignments lack merit.
Assignments of Error Nos. 10 and 11
By these assignments the defendant urges error in the trial court's concurrence with the death sentence recommended by the jury. These assignments are specified but not argued in brief.
C.Cr.P. 905.8 provides that "the court shall sentence the defendant in accordance with the recommendation of the jury." The trial court therefore had no option as to the sentence to be imposed.
*247 sentence Review
This court reviews every death sentence to determine if it is excessive. Art. 1, § 20, La.Const.; C.Cr.P. 905.9. In deciding whether a death sentence is excessive we must consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's finding of a statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
A. Aggravating Circumstance
There is ample evidence to support a finding by the jury that the victim of the crime was a peace officer engaged in his lawful duties, an aggravating circumstance to the crime of first degree murder under C.Cr.P. 905.4. Mrs. Cleveland testified that her husband left for work about five fifteen in the morning of July 2, 1977. A witness testified that the defendant's car had no taillights, and that Trooper Cleveland followed the defendant's car for several hundred feet, and then signaled for it to stop. Captain Clifton Cabell of the Louisiana State Police testified that his officers are always on call, and are considered on duty when they first climb into their units to go to work. The evidence therefore provided the jury with a basis to find that the victim was a peace officer engaged in his lawful duties.
B. Passion, Prejudice or Other Arbitrary Factors
The murder was committed in Lafayette Parish. Although an initial motion for a change of venue was denied, the difficulty encountered in selecting jurors unbiased by journalistic accounts of the case caused the court in Lafayette Parish to grant the motion when it was reurged. Venue was accordingly shifted to Ouachita Parish, where a jury was selected relatively easily.
The jury chosen in Ouachita Parish was composed of twelve white persons. There is no evidence, however, that the prosecutor purposely sought to exclude blacks from the jury. There is no indication that the prosecutor made any appeal to racial prejudice which influenced the jury in making its recommendation that the death penalty be imposed. Therefore, we cannot say that the jury's decision was made arbitrarily because of racial prejudice.
The testimony and presence in the court room of the victim's widow cannot be said to be an arbitrary factor influencing the jury's decision. Although the sight of Mrs. Cleveland may have had an effect on the jury, her testimony was relevant to the issues, and there is no evidence that her appearance as a witness caused the jury to act unreasonably or capriciously.
Nor can it be said that an inference of arbitrariness arises from the jury's recommendation of death in light of the mitigating circumstances presented to the jury. In the sentencing phase of the trial, defense counsel argues, as mitigation, that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of the defendant's natural mental condition, aggravated by intoxication at the time of the offense. The defense also argued that the defendant's youth militated against the recommendation of the death penalty. Those factors, although significant, are not so numerous and persuasive as to clearly outweigh the aggravating circumstance of the case, and are discussed in greater detail below.
C. Proportionality of the Sentence
Dalton Prejean was born in December, 1959, the second of four children. When he was two weeks old his parents sent him from their home in Lafayette to live with his aunt and uncle in Houston, Texas. Dalton was unaware of his true parentage until the age of eleven. When Dalton's father left his mother and moved to Houston, the aunt decided that Dalton had to be told that he was not her child. About this time he began creating problems of an unknown nature, and was sent to live with his mother in Lafayette.
*248 Dalton began skipping his school classes following his return to Lafayette. In March of 1972 he was committed to the Louisiana Training Institute for truancy at the instance of his mother. Released only seven months later, he soon came into conflict with the authorities on charges of burglary, theft and "false firearms." In March of 1974 he was committed to the Lafayette Juvenile Youth Authority, a residential program for delinquents. He ran away from that facility after a month; upon his return his commitment was terminated and he was released on probation to his mother.
In June of 1974 Dalton was arrested for the killing of John Doucet, a taxi driver. Dalton admitted the killing and was committed once again to the Louisiana Training Institute. In a later statement about the incident Dalton stated that he and two friends called a cab with the intention of robbing the driver. One of his companions was carrying a gun. The three directed the driver to a quiet part of town and persuaded him to stop while they searched for an address. Dalton insisted on taking the gun from his companion because the other youth appeared to be nervous. Dalton approached the driver, and believing that the driver was reaching for a gun of his own, fired twice and began running. While fleeing he told a passerby to call an ambulance because someone had been shot. Dalton later turned himself in to the police and admitted that he had killed the driver.
Dr. Patrick Dowling conducted a psychiatric evaluation of Dalton Prejean in 1974. He found the defendant to be intellectually limited and to have very poor judgment. In his opinion Dalton was a borderline mental retardate, and it was questionable if he knew the difference between right and wrong. He considered the boy to be "a definite danger to himself and others, and his dream content suggests that it is a matter of accident that the cab driver was killed rather than the boy being killed. He is equally likely to get himself killed in the near future." Dr. Dowling therefore recommended a lengthy confinement, followed by transfer to permanent facilities. The juvenile courts had jurisdiction over the defendant until he was twenty-one. R.S. 13:1572, now Article 89 of the Code of Juvenile Procedure. Dr. Dowling's recommendation would have served to keep the defendant confined until December, 1980.
In 1976, however, another doctor conducted a psychiatric evaluation of the defendant and recommended that he be discharged. He concluded that the defendant's values had changed, but cautioned that "suitable conditions [should be] imposed to be sure he had adequate supervision and is going to live in a fairly stable environment." That doctor also suggested that fairly rigid probation requirements be imposed. On December 10, 1976 Dalton Prejean was released to the custody of his aunt in Houston, apparently without any probation requirements. Within seven months Dalton was once more under arrest for killing a human being. He had lived in the relatively stable environment of his aunt's house for only three months before returning to Lafayette to live with his mother and her common law spouse. He worked offshore for a period of time but was discharged when it was discovered that he was only seventeen. Dalton was unemployed at the time of the killing of Trooper Cleveland.
Dalton was once again given psychological tests during pretrial confinement. On the basis of the Wechsler Intelligence Scale, the Stanford Binet Vocabulary Subtest and the Bender-Gestalt Test, Dr. William Hawkins determined that the defendant functioned at the dull normal level in the verbal area but in the borderline mental retardate area in the performance area. He had a verbal I.Q. of 82 and a performance I.Q. of 72. His full scale I.Q. is 76, with a full scale mental age of thirteen years and six months.
Evidence was presented to the jury that intoxication would cause a change in the behavior of such a "borderline" retardate, and would reduce his inhibitions, making it more likely that he might "act out his inner feelings."
Whether this evidence was considered mitigative by the jury is questionable. Voluntary *249 intoxication does not excuse. The combination of dull mentality, alcohol and handguns could reasonably be said to increase the probability of tragic repetition.
The actual degree of intoxication suffered by the defendant is not without some doubt. He had drunk beer and a glass of wine over an entire night. He retained sufficient control of his physical functions to drive, shoot and escape.
The record will not support a conclusion that defendant's capacity to appreciate the criminality of his conduct was so impaired because of his mental condition and intoxication that the death sentence was, for that reason, excessive. Nor does a comparison with similar cases in the district establish that the sentence was disproportionate, considering both the crime and the defendant.[3]
The conviction and sentence are affirmed.
CALOGERO and DENNIS, JJ., concur and assign reasons.
CALOGERO, Justice, concurring.
I concur in the affirmance of defendant's conviction and sentence. However, I believe that if defendant seeks a writ of habeas corpus, he is entitled to attempt to prove the systematic exclusion of blacks from his jury.
While defendant argued that blacks were excluded from the jury, he presented no evidence of the exclusion as required by our decisions in State v. Washington, 375 So.2d 1162 (La.1979) and State v. Brown, 371 So.2d 751 (La.1979). And although he requested a twenty-four hour continuance in order to obtain evidence his request was denied. Because this assignment presents a possible violation of defendant's constitutional rights, and although he has a difficult burden of proof under Washington and Brown, defendant is entitled to make a showing of the systematic exclusion.
DENNIS, Justice, concurring (in majority opinion on original hearing).
I respectfully concur. I continue to disagree, however, with the majority of this Court in its insistence upon following the federal jurisprudential rule in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), instead of Article 1, § 3 of the Louisiana Constitution in determining whether a defendant has been denied equal protection by the state's use of peremptory challenges on the basis of race. See State v. Eames, 365 So.2d 1361, 1364 (La.1979) (Dennis, J., concurring); State v. Kelly, 362 So.2d 1071, 1079 (La.1978) (Dennis, J., concurring). Nevertheless, the trial court ruling in this case did not violate our state constitution because a prima facie case of racially discriminatory peremptory challenges was not established.
DIXON, CALOGERO and DENNIS, JJ., would grant a rehearing on the penalty portion only.

ON APPLICATION FOR REHEARING
DENNIS, Justice, dissenting from denial of rehearing.
I respectfully dissent from the majority's refusal to grant a rehearing in this case with respect to the death penalty.
*250 In his application for rehearing the defendant has pointed out a fatal constitutional flaw in our scheme for imposing the death sentence. The statute mandating review of every sentence to determine if it is excessive, La.C.Cr.P. art. 905.9, and the rule of this Court establishing procedures for such review, La.Sup.Ct. Rule 28, do not provide for a review of the proportionality of each sentence in comparison with sentences in similar cases throughout the state. In fact, at present, this Court does not have the capability of this type of review, because it merely requires that the district attorney in each death case reviewed file a synopsis of each first degree murder case in his district (comprised usually of one or two Parishes) in which sentence was imposed after January 1, 1976. Furthermore, a majority of this Court has today adamantly refused to expand the basis of its proportionality review by either granting a rehearing in this case or by amending its rule to require annual reporting of capital sentence proceedings results throughout the state. Apparently, a majority of this Court is of the opinion that state-wide proportionality review is not required as part of a constitutional capital punishment scheme. In my opinion, my fellow members of the Court have fallen into error which could ultimately require the United States Supreme Court to set aside the death penalty in this and many other cases.
Louisiana's first degree murder statute was adopted in the wake of the United States Supreme Court decisions in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Each of the statutes at issue in those cases provided a varying degree of appellate review of sentencing decisions.
The Texas scheme appears to have been the least detailed. The United States Supreme Court was nevertheless satisfied that,
"By providing prompt judicial review of the jury's decision in a court with state-wide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." Jurek v. Texas, 428 U.S. at 276, 96 S.Ct. at 2958 [emphasis supplied].
Apparently, the Supreme Court regarded as important the moderating and evening effect that an appellate court with state-wide jurisdiction would have in ensuring the fair administration of the death penalty. In Florida, though the state statute was apparently silent on sentence review, the state courts had assumed jurisprudentially an obligation to review sentences and to ensure the even-handed application of the death penalty. Describing the sentencing review framework, the Supreme Court said:
"The statute provides for automatic review by the Supreme Court of Florida of all cases in which a death sentence has been imposed. . . . The law differs from that of Georgia in that it does not require the court to conduct any specific form of review. Since, however, the trial judge, must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible and the Supreme Court of Florida like its Georgia counterpart considers its function to be to `(guarantee) that the (aggravating and mitigating) reasons present in one case will reach a similar result to that reached under similar circumstances in another case....'" Proffitt v. Florida, 428 U.S. at 250-251, 96 S.Ct. at 2966.
By far the most detailed of the appellate review schemes was that provided by the Georgia statute. The Supreme Court described the Georgia statute as follows:
"In addition to the conventional appellate process available in all criminal cases, provision is made for special expedited direct review by the Supreme Court of Georgia of the appropriateness of imposing the sentence of death in the particular case. The court is directed to consider `the punishment as well as any errors enumerated by way of appeal' and to determine:

*251 `(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
`(2) Whether, in cases other than treason or aircraft highjacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance... and
`(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.'...
"If the court affirms a death sentence, it is required to include in its decision reference to similar cases that it has taken into consideration....
"A transcript and complete record of the trial, as well as a separate report by the trial judge, are transmitted to the court for its use in reviewing the sentence.... The report is in the form of a 6½-page questionnaire, designed to elicit information about the defendant, the crime, and the circumstances of the trial. It requires the trial judge to characterize the trial in several ways designed to test for arbitrariness and disproportionality of sentence." Gregg v. Georgia, 428 U.S. at 166-167, 96 S.Ct. at 2922.
Upon a state constitutional provision that in any event already provided for excessiveness review, this state by both statute and rule has adopted a death penalty review framework that is almost identical to the one described in Gregg v. Georgia, supra. La.C.Cr.P. art. 905.9 enjoins this Court to "review every sentence of death to determine if it is excessive" and directs the Court to "establish such procedures as are necessary to satisfy constitutional criteria for review." Acting pursuant to that direction, this Court adopted Rule 28, § 1 of which places upon this Court the same burden and manner of review imposed upon the Georgia Supreme Court by statute. The language of Section 1, virtually identical to the Georgia statute, provides:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
"(a) [W]hether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) [W]hether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) [W]hether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Rule 28, § 1; Rule 905.9.1.
In State v. Sonnier, 379 So.2d 1336 (La. 1979), this Court recognized that, "This is the same procedure for review authorized by Georgia statute approved by the United States Supreme Court in Gregg v. Georgia, supra." This Court having been directed to adopt constitutional criteria for sentencing review, and having chosen those criteria used in Georgia and approved by the United States Supreme Court, it is appropriate to refer to the Georgia framework to divine the full nature of this Court's obligation under its adopted rule. The Supreme Court in Gregg v. Georgia, supra, described how the Georgia system operated and approved it.
"In performing its sentence-review function, the Georgia court has held that `if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive.' Coley v. State, 231 Ga. [829], at 834, 204 S.E.2d [612], at 616. The court on another occasion stated that `we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally...' Moore v. State, 233 Ga. 861, 864, 213 S.E.2d 829, 832 (1975). See also Jarrell v. State, supra, 234 Ga. [410] at 425, 216 S.E.2d [258], at 270 (standard is whether `juries generally throughout the state have imposed the death penalty'); Smith v. State, 236 Ga. 12, 24, 222 S.E.2d 308, 318 (1976) (found a `clear pattern' of jury behavior).
"It is apparent that the Supreme Court of Georgia has taken its review responsibilities seriously. In Coley, it held that *252 `[t]he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death.' 231 Ga., at 835, 204 S.E.2d, at 617. It thereupon reduced Coley's sentence from death to life imprisonment. Similarly, although armed robbery is a capital offense under Georgia law, § 26-1902 (1972), the Georgia court concluded that the death sentences imposed in this case for that crime were `unusual in that they are rarely imposed for (armed robbery). Thus, under the test provided by statute, .. they must be considered to be excessive or disproportionate to the penalties imposed in similar cases.' 233 Ga., at 127, 210 S.E.2d, at 667. The court therefore vacated Gregg's death sentences for armed robbery and has followed a similar course in every other armed robbery death penalty case to come before it ..
"The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." Gregg v. Georgia, 428 U.S. at 204-206, 96 S.Ct. at 2940. [emphasis supplied]
Plainly, the Georgia Supreme Court has interpreted its statute, identical to our rule, as requiring it to compare any case before it with all "similar cases" not simply those from one particular court but those from throughout the state. Additionally, the Georgia Supreme Court considers not only those murder cases in which a capital conviction was obtained but also those murder cases in which life imprisonment was recommended. Gregg v. Georgia, supra, 428 U.S. 204, 96 S.Ct. 2909. The Georgia scheme, premised upon the same language as the Louisiana scheme, is one that provides for state-wide comparisons with all "similar cases," whether or not death was recommended, and it is this scheme, and this scheme alone, that was approved by the United States Supreme Court in Gregg v. Georgia as providing a sufficient format for appellate review of jury sentencing decisions.
As I read Gregg, Jurek and Proffitt, this Court must give the same meaning to its rule as the Georgia court gave to its statute; this Court should, accordingly, judge the proportionality of each death penalty by comparing it with all "similar cases" throughout the state, both those in which death was recommended and those in which life was recommended. The language of the rule itself, the policies underlying that rule, and the aberrations that would flow from any other interpretation require such a result.
NOTES
[*] Chief Judge Paul B. Landry, Retired, is sitting by assignment as Associate Justice Ad Hoc in place of Tate, J.
[1] See State v. Daniel, 378 So.2d 1361 (La. 1979), which held that where the juror's inaccurate testimony was the result of misunderstanding and the juror's relationship to the case was not a necessary grounds for a challenge for cause, there were no grounds for reversal. Cf. State v. Square, 257 La. 743, 244 So.2d 200 (1971), which suggested that discovery of the fact that a juror had lied or supplied erroneous information on voir dire would be grounds for a new trial. See also State v. Buggage, 351 So.2d 95 (La.1977).
[2] In State v. Passman, 345 So.2d 874 (La.1977), the court used the standard for determining if a continuance should have been granted under C.Cr.P. 709 to decide if the trial court properly denied defendant a delay based on the absence of witnesses. A continuance is granted at the sound discretion of the trial court. It is clear that the defendant in the instant case moved for a delay under C.Cr.P. 853 rather than a continuance under C.Cr.P. 709.
[3] Since January 1, 1976 there have been two first degree murder verdicts rendered in the Fifteenth Judicial District, where the crime was committed. Gloria Aucoin, a twenty-six year old married woman, was convicted of the first degree murder of her eight year old daughter. The state argued as an aggravating circumstance that the killing had been committed in a heinous, atrocious and cruel manner. The defendant claimed that she had acted as a result of mental disease or defect and drug addiction resulting from prior medical treatment. The jury recommended a sentence of life imprisonment. This court affirmed the conviction and sentence in State v. Aucoin, 362 So.2d 503 (La.1978). Theresa Thibeaux was convicted of the first degree murder of her husband. Prior to the killing the couple had quarreled and the husband had struck Mrs. Thibeaux several times. No evidence of aggravating circumstances was offered and the defendant was sentenced to life imprisonment. This court reversed the conviction because of errors committed by the trial court as to the admissibility of evidence of prior physical abuse of the defendant by her husband. State v. Thibeaux, 366 So.2d 1314 (La.1978).

In the Fourth Judicial District, where the defendant was tried, there has been only one first degree murder verdict rendered since January 1, 1976. Charlie Lee Carter shot Alfred C. Carter several times with a .38 caliber revolver. On the recommendation of the jury Carter was sentenced to serve life imprisonment.