402 So.2d 650 (1981)
STATE of Louisiana
v.
Elmo Patrick SONNIER.
No. 80-K-1846.
Supreme Court of Louisiana.
June 22, 1981.
Rehearing Denied September 4, 1981.
*653 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Knowles M. Tucker, Dist. Atty., Dracos Burke, Asst. Dist. Atty., for plaintiff-appellee.
Allen McElroy, Jr., McElroy & Ramsey, Ltd., Berwick, for defendant-appellant.
DENNIS, Justice.
This is Elmo Patrick Sonnier's second appeal from sentences of death for slaying two youths parked on a country road. In his first appeal this court affirmed his first degree murder convictions, reversed his death sentence because of a procedural error which occurred during the penalty hearing, and remanded the case for a new sentence proceeding.State v. Sonnier, 379 So.2d 1336 (La.1980). The district court conducted such a hearing and again sentenced Sonnier to death in accordance with the jury's recommendation. In this appeal Sonnier argues that his death sentences are based on both procedural and substantive errors. He also seeks to attack his convictions and obtain a new trial on the question of guilt or innocence despite the finality of this court's decree on these issues.
Ultimately, we conclude that defendant's sentence of death must be affirmed. A new sentencing proceeding was conducted eliminating the error which caused reversal of the original sentence. Defendant's appeal raises no new issues which warrant a second nullification.
In assessing the extent of Elmo Patrick Sonnier's culpability in the first degree murders, the jury in the sentence proceeding now under review had to sift through several versions of the facts accumulated in numerous inculpatory statements and three trials. When Elmo Patrick Sonnier and his brother, Eddie James Sonnier, were first apprehended they each gave a confession laying the blame primarily on Elmo, the older brother and the only one with a felony crime record. The state first prosecuted Elmo Patrick Sonnier and obtained convictions of first degree murder and death sentences, *654 based primarily on Sonnier's confessions and his brother's testimony, which, contrary to Elmo Patrick Sonnier's trial testimony, depicted Elmo as the instigator and the victims' actual executioner. The state next prosecuted the younger brother, Eddie James Sonnier and was again successful in obtaining convictions and death penalties. However, both brothers' death penalties were reversed on appeal: Elmo Patrick Sonnier's because of a procedural error, which required that his case be remanded for a new sentencing proceeding. 379 So.2d at 1368-72; Eddie James Sonnier's because the death penalty was excessive in view of his subsidiary role in the crimes, requiring reduction of his sentences to life imprisonment without parole. State v. Sonnier, 380 So.2d 1 (La.1979). At Elmo's second penalty hearing, on remand, his brother Eddie, no longer exposed to the death penalty, dramatically changed his story to coincide with Elmo's testimony. Eddie recanted his previous testimony and claimed that he, instead of Elmo, pulled the trigger of the murder weapon and played the dominant role throughout the criminal episode. The prosecution, however, effectively used the brothers' confessions and Eddie's previous trial testimony to challenge their credibility. Consequently, the jury's threshold question was whether Elmo Patrick Sonnier was the principal malefactor or a compliant follower in the course of criminal conduct.
The jury's apparent conclusion that Elmo Patrick Sonnier was primarily responsible for the murders and should be sentenced to death is warranted by the record. From the evidence the jury could have found beyond a reasonable doubt that Elmo played the predominant role in the actual killings and most of the aggravating circumstances. Specifically, the evidence adequately supports the following factual findings.
On the evening of November 4, 1977 Elmo Patrick Sonnier and his younger brother, Eddie James Sonnier, left St. Martinville in Elmo's car to go rabbit hunting. With them they carried two .22 caliber rifles, two sheriff or security guard badges and a set of handcuffs. After spending a considerable time riding around, Elmo suggested they look for lovers in parked automobiles. They soon came across an automobile parked in a remote part of St. Martin Parish at about 1:00 a. m. Elmo Patrick Sonnier approached the car and displayed his badge to the young occupants, David LeBlanc and Loretta Bourque. Posing as a police officer, Elmo told David and Loretta that he was taking them to the landowner who would determine whether to press charges against them for trespassing. Elmo ordered them from the automobile, confiscated their licenses and handcuffed them. However, because Elmo's car had a flat tire, the youths were placed in the back seat of their own vehicle. Elmo told his brother to drive, but Eddie refused. Elmo took the wheel and drove the automobile with his three passengers twenty-one miles over rural roads he had learned as a local cab driver to a remote oil field in Iberia Parish. David and Loretta were removed from the car, and the young man was handcuffed to a tree. After telling Eddie he was going to "scare" them, Elmo led Loretta into the woods, leaving David with his brother.
Growing impatient for his brother's return, Eddie James Sonnier followed him into the forest. Upon discovering that Elmo had forced Miss Bourque to have sexual intercourse, Eddie talked to her and she submitted to him also in return for the couple's safe release. After the second rape, Bourque and LeBlanc were brought back toward the car. But Elmo told his brother the victims could not be released because they now had information which could send him back to prison. David and Loretta were forced to lie on the ground side by side. Elmo Patrick Sonnier fired six .22 caliber rifle shots alternately into the heads of the youths while his brother held a flashlight. The first two shots were sufficient to kill them instantaneously.
The brothers left the bodies and drove LeBlanc's car back to the scene of the abduction. After changing Elmo's flat tire they kept a jack taken from the LeBlanc vehicle. The next day the brothers divided some money taken from the young couple *655 and buried the rifles in another remote area.
Many of the facts of this narrative casting Elmo Patrick Sonnier in the dominant role were controverted by the testimony of both brothers at his second penalty hearing. Nevertheless, the jury was justified in rejecting their testimony at this hearing because of the brothers' confessions, Eddie James Sonnier's previous trial testimony and other weaknesses and inconsistencies in the brothers' testimony.
Defendant has filed seven assignments of error. Although some of these overlap with arguments on capital sentence review and others are not properly raised at this stage of the proceedings, we will consider them all. Furthermore, in this capital case, we will notice and pass judgment on any other error which appears in the record.

Assignment of Error Affecting the Determination of Guilt
Assignment of Error Number 2
In assignment number two the defendant argues that it was error for the trial court to deny his motion for a new trial on the question of guilt based on Eddie James Sonnier's testimony that he, not Elmo, actually killed the victims and played the dominant role in each aggravating circumstance found by the jury. Pretermitting whether the motion was timely, we find no merit in the assignment.
A trial judge must grant a new trial whenever new and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty. La.C.Cr.P. art. 851. In the present case the trial judge reasonably could have concluded that Eddie's recantation would not have created a reasonable doubt of guilt in the mind of any reasonable juror.
If the recantation could have been introduced in evidence at trial along with Eddie's testimony casting most of the blame on his brother, it, of course, would have had some effect. However, in fairly assessing the effect, we must also hypothesize that the jury would have been aware that Eddie changed his story after being relieved of fear of the death penalty and that he had an opportunity to confer with Elmo about his testimony. Also, the jury had before it, not only Eddie's original testimony, but the confessions of both Eddie and Elmo which placed the smoking gun in Elmo's hands. Furthermore, Eddie's recantation did not totally exculpate Elmo from complicity in the crime of first degree murder. It confirmed that he was a willing participant in the events leading up to and following the actual killings. In view of the other evidence pointing to Elmo as the real instigator and executioner, we agree that Eddie's recantation probably would not have changed the verdict of guilty of first degree murder if it had been introduced.

Assignments of Procedural Error Affecting Sentence
Assignment of Error Number 4
In assignment number four defendant argues that the trial court erred by failing to exclude all witnesses from the courtroom during closing arguments. He contends that the presence during closing arguments of a father of one victim and the police officer witnesses unduly influenced the jury to impose the death penalty.
The court may order that the witnesses be excluded from the courtroom or from where they can see or hear the proceedings and refrain from discussing the facts of the case or the testimony of any witness with any one other than the district attorney or defense counsel; the court may modify its order in the interest of justice. La.C.Cr.P. art. 764. The purpose of this article is to insure that a witness will testify as to his own knowledge of the case without being influenced by testimony of other witnesses and to strengthen the role of cross-examination in developing the facts. State v. Walton, 360 So.2d 166 (La. 1978); State v. McDaniel, 340 So.2d 242 (La.1976).
*656 In this case, the purpose of sequestration of the witnesses was fulfilled, since they had completed their testimony when they were allowed to listen to closing arguments. The statutory rule permits the court to terminate or modify sequestration after a witness' testimony can no longer be influenced or in the interest of justice. La. C.Cr.P. art. 764. Nevertheless, in the event of actual prejudice to a defendant in a capital case, the trial court's failure to exclude a witness would constitute error. However, in the present case there was no showing of actual prejudice or extraordinary circumstances from which we may infer that prejudice occurred. Cf. State v. Prejean, 379 So.2d 240 (La.1980).
Assignment of Error Number 5
In assignment number five defendant complains of the trial court's refusal to give the following special written charge: "I charge you that in your deliberations on punishment, you are not to return a sentence of death if you determine that the defendant, Elmo Patrick Sonnier, was not the responsible party who pulled the trigger on the weapon which killed the victims."
A requested special charge must be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. La.C.Cr.P. art. 807. In this case the requested charge was not wholly correct and did require qualification, limitation and explanation.
One who aids and abets in the commission of a first degree murder may be charged and convicted of the crime as a principal, provided that he specifically intended to kill or to inflict great bodily harm on the victim. State v. Holmes, 388 So.2d 722 (La.1980); cf. State v. McAllister, 366 So.2d 1340 (La.1978). The capital punishment scheme by which this case is governed calls for the sentencing hearing to focus on the circumstances of the offense and the character and propensities of the offender. La.R.S. 14:30 (1950), as amended by 1976 Acts, No. 657, § 1; La.C.Cr.P. arts. 905 et seq., as enacted by 1976 Acts, No. 694, § 1. In a proceeding to determine penalty, however, the jury is not required to recommend a sentence of life imprisonment merely because the defendant did not himself directly commit the act constituting the first degree murder. Instead, the jury should weigh the fact that the murder weapon was employed directly by the defendant's accomplice, rather than the defendant, as a mitigating circumstance in determining the appropriate penalty. La.C.Cr.P. art. 905.5(g).
Several members of the United States Supreme Court are of the view that it violates the Eighth Amendment to impose the death penalty without a finding that the defendant possessed a purpose to cause the death of the victim. See Lockett v. Ohio, 438 U.S. 586, 619, 98 S.Ct. 2954, 2972, 57 L.Ed.2d 973 (Marshall, J., concurring), 621, 98 S.Ct. at 2973 (White, J., concurring and dissenting). Furthermore, it is clearly unconstitutional to impose the death penalty in such a case without permitting the jury to consider as a mitigating circumstance the fact that the defendant did not personally commit the murder. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, Louisiana's capital punishment regime is not vulnerable to attack on either score. A finding that an accomplice specifically intended to kill or to inflict great bodily harm is necessary before he can be convicted of first degree murder. State v. Holmes, supra. The sentencing proceeding jury may consider as a mitigating circumstance that the offender was a principal whose participation was relatively minor, and any other relevant mitigating circumstance. La.C.Cr.P. art. 905.5(g), (h).
Assignment of Error Number 6
In assignment number six defendant contends reversible error occurred when the court refused to give another special requested charge:
"Ladies and Gentlemen of the jury, I charge you that in your determination of punishment, you must make a determination that any aggravating circumstance has been proven to exist by competent evidence beyond a reasonable doubt. Further, in determining whether any mitigating *657 circumstance has been proven to exist you must determine that such does exist unless such is disproved by the State of Louisiana by proof beyond a reasonable doubt. Thus, if the State of Louisiana fails in its proof of any aggravating circumstance, you are to return a sentence of life imprisonment. Further, if the State of Louisiana fails to disprove that any mitigating circumstance exists, then you are to return a sentence of life imprisonment."
The defendant's special requested charge is based on a misunderstanding of the capital sentence proceeding. After a verdict of guilty to first degree murder, a sentencing hearing is conducted. La.C. Cr.P. arts. 905 et seq. The sentence will be life imprisonment unless the jury finds unanimously and beyond a reasonable doubt at least one statutorily defined "aggravating circumstance." La.C.Cr.P. art. 905.3. Having found an aggravating circumstance, however, the jury is not required to impose the death penalty. Instead, it is merely authorized to impose it after considering evidence of any mitigating circumstances. La.C.Cr.P. art. 905.3. Unless the jury determines unanimously that the death penalty should be imposed, the defendant will be sentenced to life imprisonment without parole, probation or suspension of sentence. In the event the jury imposes the death penalty, it must designate in writing the aggravating circumstance which is found to exist beyond a reasonable doubt. La.C. Cr.P. art. 905.7. See State v. Payton, 361 So.2d 866 (La.1978).
The capital sentencing procedure does not establish any presumptions or burdens of proof with respect to mitigating circumstances. The jury is required to consider evidence of any mitigating circumstances, and to weigh it against any aggravating circumstance which it has unanimously found beyond a reasonable doubt, before recommending the more appropriate penalty, either a penalty of life imprisonment without parole or a sentence of death. Accordingly, the defendant's special requested charge is incorrect in the several instances in which it is inconsistent with this procedure.

Assignment of Substantive Errors Affecting the Sentence
Assignments of Error Numbers 1, 3 and 7
In assignments numbers one, three and seven defendant expounds a mixture of arguments. He contends that he has been denied equal protection of the laws by having been selected as the only one to receive the death penalty of two accomplices convicted of the same crime. Moreover, he argues the evidence does not warrant a finding that his culpability was so much greater than his brother's as to justify the death penalty.
The statutes under which defendant's death sentence was imposed were based on those approved by the United States Supreme Court as providing adequate standards to guide the jury in selecting those among first degree murderers who should receive the death penalty. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); State v. Payton, 361 So.2d 866 (La.1978). There is nothing in the rationale of the high court's decision which would indicate that the same selection process could not be used to decide who, if anyone, among persons involved in the same first degree murder, should be chosen to suffer capital punishment.
For reasons previously given in this opinion, we conclude that the evidence adequately supports findings that defendant initiated a course of criminal conduct which culminated in his direct commission of two first degree murders, that he played the predominant role in each of the aggravating circumstances found by the jury, and a finding that the death sentence is the appropriate penalty in his case.

CAPITAL SENTENCE REVIEW
Every sentence of death is reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court determines whether the sentence was imposed under *658 the influence of passion, prejudice or any other arbitrary factors, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Louisiana Supreme Court Rule 28, § 1.

A. Aggravating Circumstances

In recommending the death penalty, the jury found and listed five aggravating circumstances. La.C.Cr.P. arts. 905.4, 905.7. We have reviewed the record with respect to each aggravating circumstance and conclude that the evidence is sufficient to support a reasonable jury's finding beyond a reasonable doubt of four of the five aggravating circumstances.
The jury found that the offender was engaged in the perpetration of aggravated kidnapping. La.C.Cr.P. art. 905.4(a). Aggravated kidnapping includes the forcible seizing and carrying of a person from one place to another with the intent to force the victim to give up anything of apparent value, or to grant an advantage or immunity to secure his or her release. La. R.S. 14:44. Sexual gratification constitutes something of apparent value for purposes of the statute. State v. Eddie Sonnier, 380 So.2d 1 (La.1980);State v. Dupre, 369 So.2d 1303 (La.1979). The record supports a finding beyond a reasonable doubt that Elmo Patrick Sonnier seized and carried the couple from one place to another with the intention of forcing the female victim to have sexual intercourse with him.
The jury found that the offender was engaged in the perpetration of aggravated burglary and armed robbery. La.C. Cr.P. art. 905.4(a). Aggravated burglary includes the unauthorized entering of a movable where a person is present, with the intent to commit a felony or theft therein, when the offender is armed with a dangerous weapon. La.R.S. 14:60. Armed robbery is the theft of anything of value from the person or immediate control of another by use of force or intimidation, while armed with a dangerous weapon. La.R.S. 14:64. Evidence was introduced that Elmo Patrick Sonnier was armed with a dangerous weapon when he entered the automobile in which the victims were parked, that he intended to commit kidnapping and theft, and that he and Eddie committed armed robbery by taking money, wallets and drivers' licenses from the victims.
The jury found that the offender knowingly created a risk of death or great bodily harm to more than one person. La.C.Cr.P. art. 905.4(d). A majority of this court has held that this aggravating circumstance is established when the defendant by a single and consecutive course of conduct contemplates and causes a great risk to more than one person. State v. Monroe, 397 So.2d 1258 (La.1981); State v. Culberth, 390 So.2d 847 (La.1980). In this case the execution of two victims lying side by side with six rapid rifle shots clearly amounts to a single consecutive course of conduct by which defendant contemplated a great risk to more than one person.
The jury found that each offense of first degree murder was committed in an especially heinous, atrocious or cruel manner. La.C.Cr.P. art. 905.4(g). This court has held that in order for the jury to conclude that the offense was committed under this aggravating circumstance there must exist evidence, from which the jury could find beyond a reasonable doubt, that there was torture or the pitiless infliction of unnecessary pain on the victim.[1]State v. Monroe, 397 So.2d 1258 (La.1981); State v. English, 367 So.2d 815, 823 (La.1979).
The United States Supreme Court's decision in Godfrey v. Georgia, 446 U.S. 420,100 *659 S.Ct. 1759, 64 L.Ed.2d 398 (1980) contains lessons pertinent to the application of Louisiana's "especially heinous manner" aggravating circumstance. In that case, the high court reversed death sentences based on convictions of two counts of murder and a Georgia jury's finding that the aggravating circumstance as to each conviction was that the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." The evidence at trial showed that the defendant went to a trailer where his wife, mother-in-law and daughter were located, shot his wife in the head with a shotgun through a window, killing her instantly, and then proceeded into the trailer, where after striking and injuring his fleeing daughter with the barrel of the gun he shot his mother-in-law in the head also killing her instantly. The trial court, in instructing the jury on the aggravating circumstance, merely quoted the bare statutory language. The Georgia Supreme Court, in affirming the sentences, held that the evidence supported the jury's finding of the statutory aggravating circumstance and simply asserted that the verdict was "factually substantiated."
Although unable to agree on an opinion, six members of the United States Supreme Court agreed that the Georgia Supreme Court had erred in violation of the Eighth and Fourteenth Amendments in affirming the death sentences. Because of the lack of a majority opinion and the complexity of the plurality opinion, the scope of the court's decision is uncertain. The court held clearly that a death sentence cannot be upheld on the ground that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved ... depravity of mind" without a narrowing construction of "depravity of mind" by the state supreme court providing rational criteria for distinguishing a case in which the death penalty is to be imposed from the many cases in which it is not. 100 S.Ct. at 1767, 64 L.Ed.2d at 409. Additionally, the various opinions of the justices expound two other recommendations or nascent rules of law: (a) a death sentence may be upheld on the ground that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture" if "torture" is construed so as to require evidence of serious physical abuse of the victim before death, 100 S.Ct. at 1766 (plurality opinion of Stewart, J.) and (b) it is not enough for a reviewing court to apply a narrowing construction to ambiguous terms such as "depravity of mind" or "torture;" the jury must be instructed on the proper, narrow construction of the statute. 100 S.Ct. at 1765 (plurality opinion of Stewart, J.); 100 S.Ct. at 1769 (Marshall, J., concurring).
Because of the similarity of thought and language in the Georgia and Louisiana statutory definitions of "especially heinous" and "outrageously vile" aggravating circumstances, some of the teachings of Godfrey are directly applicable to the Louisiana capital punishment regime: This court should continue to apply the narrowing construction it has employed in previous cases, viz., in order for the jury to find that the offense was committed in an especially heinous, atrocious or cruel manner there must exist evidence, from which the jury could find beyond a reasonable doubt, that there was torture or the pitiless infliction of unnecessary pain on the victim. This construction should be clarified to include an explanation that "torture" requires evidence of serious physical abuse of the victim before death. Finally, since the United States Supreme Court has made it clear that the sentencer's discretion must be channelled and guided by clear, objective and specific standards, this court should require that juries considering whether to impose the death penalty on the basis of this aggravating circumstance must be instructed on the proper, narrow construction of the statute.
In the present case the jury's findings that the homicides were committed in an especially heinous, atrocious or cruel manner were of questionable constitutional validity. The jury was not instructed on the proper, narrow construction of the statute. There was no evidence that the male victim was subjected to any serious physical abuse, *660 and the evidence may not be constitutionally sufficient to support a finding that the female was a victim of torture or the pitiless infliction of unnecessary pain.
However, the evidence was clearly sufficient to support the jury's findings of four out of the five aggravating circumstances it listed. A majority of this court has held that it knows of no constitutional requirement that a death sentence be vacated whenever the jury errs in only one of its findings of several statutory aggravating circumstances.[2]State v. Monroe, 397 So.2d 1258 (La.1981). Accordingly, the failure of one his aggravating circumstance in this case does not so taint the proceedings as to invalidate the other aggravating circumstances found or the sentence of death.

B. Proportionality of Sentence

Upon reviewing Elmo Patrick Sonnier's first appeal, the original opinion of this court set forth in detail his significant characteristics and propensities, as reflected by the record:
"Elmo Patrick Sonnier is a white male, age twenty-eight years (twenty-six at the time of the offense). He attended school through the seventh grade at which time he quit and went to work in the oil fields. The Wechsler Adult Intelligence Scale Test conducted on January 31, 1978, indicated a verbal I.Q. score of dull-normal range (84), a performance I.Q. score in the average range (98) and a full scale I.Q. in the average range (90). No neurological impairment was noted by the Bender-Gestalt Test. The Rorschach Examination indicated the defendant had contact with reality and there were indications of a potential for above average creativity and intelligence.
"Sonnier's criminal record reveals five arrests as a juvenile: disturbance (no disposition); simple burglary and simple criminal damage (indefinite period of supervised probation); simple burglary (continued probation until April 24, 1967); fight (released); juvenile trouble (released). His adult record includes an attempted theft of a boat for which he was released. He was convicted on two counts of auto theft in 1968 and sentenced to four and three years at hard labor. (The sentences ran concurrently.) He was paroled in 1970. On July 7,1970, he was arrested on a charge of theft by false pretenses but the case was dismissed. In November of 1970, he was arrested and charged with the theft of a shotgun and a television which resulted in his parole being revoked. During the period he was on parole, he was in trouble for non-support, and changing jobs and residences. Defendant served out his term at Angola and was discharged on March 10, 1972.
"Defendant worked in the oil fields until 1975, except for the period he was at Angola. He worked on a hog farm in Texas for one year and returned to Louisiana in 1976. He was then employed by Hub Security until September of 1976 when he was fired because he had falsified his application for employment and his employer suspected he had stolen some money from a client. The defendant then took a job with B & B Security Police until March of 1977 when he began working for Jo-Dee Equipment Rental where he was employed at the time of his arrest. He was regarded by Jo-Dee as a reliable employee." 379 So.2d 1362-63.
The record before us today does not reveal any relevant new evidence of the defendant's character or propensities.
On defendant's first appeal this court compared his case extensively with two other first degree murder cases in the district in which sentence was imposed after January 1, 1976: (1) James Lee Bullock; (2) Frank Bennett. State v. Sonnier, 379 So.2d *661 at 1363. Since his first appeal there have been two additional first degree murder cases in the district in which sentence was imposed.
Marcel Knott was tried in St. Mary Parish after a change of venue from St. Martin Parish was ordered. The case grew out of a feud between two families, the Knotts and the Hayes, who had been close friends at one time but who had been divided by an inter-family dispute. One evening Knott and his wife were in Henderson where they backed into a parked car. Officers Hayes and Courville investigated the accident and were subjected to such verbal abuse by Mrs. Knott that Officer Hayes forced her into the patrol car. Knott then began shooting at the officers, killing Courville but only wounding Hayes. He was convicted of second degree murder and was sentenced to life imprisonment. For a comparison of the Knott case with Eddie James Sonnier's case see State v. Sonnier, 380 So.2d 1, 7-9 (La. 1980).
David Liner was convicted of first degree murder but the jury sentenced him to life imprisonment. Liner was convicted of murdering his neighbor by repeatedly stabbing her with forks and butter knives until she bled to death. The attack was precipitated by the victim's rejection of Liner's sexual advances which followed an argument that Liner had with his wife earlier the same evening. At the trial there was expert testimony to the effect that Liner had been psychotic, a schizophrenic and paranoid type, for at least ten years. In addition one expert testified that the defendant did not know the difference between right and wrong with respect to the offense. In addition at the sentencing phase of the trial the father of the victim who had known Liner all his life took the stand and asked that the jury spare his life. See State v. Liner, 397 So.2d 506 (La.1981).
The other first degree murder trials in the district were a result of the murders in this case. Eddie James Sonnier was convicted of first degree murder and sentenced to death, but we reversed his conviction because our review of the record in his case indicated that the jury's recommendation of death did not conform to the sentences meted out in the other first degree murder cases because the defendant's intent to kill was not clearly shown in Eddie's case, because the jury apparently ignored several mitigating factors and because we concluded that the evidence indicated that Eddie played a relatively minor role in the creation of the aggravating circumstances found by the jury. 380 So.2d at 8-9. Elmo Patrick Sonnier's first penalty proceeding, of course, also resulted in a death sentence which we reversed because of an erroneous and misleading jury instruction. 379 So.2d at 1369-72.
The homicides in Bullock, Bennett, and Knott all occurred after there was an altercation or confrontation between the victims and the defendants. These cases thus differed from the instant case in at least this respect. It is true that the victims in Bullock and Liner suffered more painful deaths, but in this case there was evidence of rape and kidnapping not present in any of the other murders. In both Bennett and Liner there was significant evidence questioning defendant's sanity or mental stability. There was no evidence that Elmo Patrick Sonnier had a mental disease or incapacity. Although the murder in Liner was as shocking and senseless, Liner's questionable mental stability and the plea by the victim's father in that case explains the jury's decision to spare his life. The death penalty in the present case, therefore, does not appear arbitrary, capricious or disproportionate to the results reached in other first degree murder trials in the district.

C. Passion, Prejudice or Arbitrariness

The death sentence in this case involved no issue of racial prejudice. Both the victims and the perpetrators were white. Nor did local passion play a role in this sentencing hearing, for venue for the sentencing hearing was changed from New Iberia, the site of the crime and first trial, to St. Mary Parish. Our review of the record does not indicate that the death penalty was imposed arbitrarily or without reason.

*662 Conclusion

The defendant's convictions and sentences of death are affirmed.
AFFIRMED.
LEMMON, J., concurs.
MARCUS, J., concurs and assigns reasons.
BLANCHE, J., concurs with reasons.
MARCUS, Justice (concurring).
I agree that defendant's convictions and sentences should be affirmed; however, I consider that the murders were committed in an "especially heinous, atrocious or cruel manner." Accordingly, I respectfully concur.
BLANCHE, Justice (concurring).
I concur in the very excellent sentence review, but dissent from the opinion's holding that the crime was not committed in an especially heinous, atrocious or cruel manner. I do agree that although all murders are heinous and atrocious, any system that seeks to distinguish rationally among murders in terms of heinousness must necessarily incorporate into that concept some idea of torture, or the pitiless infliction of unnecessary pain on the victim. I would not, however, limit the infliction of pain to physical pain, as mental pain may be as much or more devastating in its nature and scope.
The young female victim in this case was piteously raped by the defendant and gave in to his brother in order to secure the safe release of herself and her boyfriend. Thereafter, she and her boyfriend were turned face down on the ground and executed, the first shot missing its mark.
In my view, rape is an infliction of unnecessary pain on the victim, and amounts to both mental as well as physical torture. See this writer's original opinion in this case at 379 So.2d 1336 (La.1980).
NOTES
[1] On one occasion, in Elmo Patrick Sonnier's first appeal, in the original opinion of this court, a majority subscribed to the notion that the "torture or pitiless infliction of pain" could be either "physical or psychological." State v. Sonnier, 379 So.2d 1336, 1361 (La.1980). In retrospect, this appears to be such a broad and vague addition to our construction of the aggravating circumstance as to violate the Eighth and Fourteenth Amendments. See Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).
[2] On several occasions, I have dissented from this opinion. See State v. Monroe, 397 So.2d 1258 (La.1981); State v. Williams, 383 So.2d 369, 375 (La.1980); State v. Sonnier, 379 So.2d 1336, 1364 (La.1980); State v. Martin, 376 So.2d 300, 314 (La.1979). However, my view has failed to garner any other vote on this court. Acknowledging the futility of continual dissents on this issue, I reluctantly join the majority position until such time as its error is recognized by other members of this court or the United States Supreme Court.