**Dalton PREJEAN, Petitioner–Appellant,**

v.

**Larry D. SMITH, Warden, Louisiana State Penitentiary, Respondent–Appellee.**

No. 89–4850.

United States Court of Appeals, Fifth Circuit.

Nov. 28, 1989.

John H. Hall, Debevoise & Plimpton,
Mitchell A. Karlan, Gibson, Dunn &

Crutcher, New York City, Mayer, Brown & Platt, Chicago, Ill., and Samuel S. Dalton, Jefferson, La., for petitioner-appellant.

J. Nathan Stansbury, Lafayette, La. and William J. Guste, Jr., Atty. Gen., Baton Rouge, La., for respondent-appellee.

Before CLARK, Chief Judge, and POLITZ and JOHNSON, Circuit Judges.

CLARK, Chief Judge:

This successive habeas corpus petition by Dalton Prejean asserts four issues: (1) The jury selection procedures were improper; (2) he received ineffective assistance of counsel; (3) he is a brain-damaged, retarded juvenile whose execution would be unconstitutional; and (4) state control over aspects of the prosecution denied him a fair trial in connection with his motion for a certificate of probable cause and stay of execution. We deny both motions.

## THE CRIME

The following statement is taken verbatim from the opinion of the Supreme Court of Louisiana:

At about five o'clock in the morning of July 2, 1977, the defendant, his brother Joseph, Michael George and Michael Broussard left Roger's Nite Club in Lafayette Parish. The four had spent the night drinking in various lounges in the vicinity. They left Rogers' Nite Club in a 1966 Chevrolet driven by the defendant, with his brother in the front seat and the other two in the back. The car's taillights were not working, and within a few hundred feet of the lounge, State Trooper Donald Cleveland, who was on his way to work driving his police vehicle, signaled the Chevrolet to stop. The defendant and his brother attempted to switch places in the front seat because the defendant had been driving without a license. The officer noticed the switch and ordered the occupants out of the car. He told Michael George and Michael Broussard to get back in, however, and began to search Joseph Prejean. Dalton Prejean, back in the car, stated, "I don't like the way he's doing my brother." (This was a reaction to the trooper's pushing Joseph against the car, over Joseph's protest.) Defendant then took a .38 caliber revolver from under the car seat, got out of the car and approached the officer with the gun hidden against his leg. As he neared the trooper he fired without warning. Trooper Cleveland was struck by two bullets and was killed. The defendant and his companions fled the scene but were apprehended several hours later.

*State v. Prejean*, 379 So.2d 240, 241–42 (La.1979).

## PROCEDURAL CHRONOLOGY

July 2, 1977: Louisiana State Trooper Donald Cleveland was in the process of conducting a traffic stop when Dalton Prejean pulled a concealed pistol and shot him to death.

May 11, 1978: A jury convicted Prejean of capital murder and fixed the death penalty for his crime.

November 29, 1979: The Louisiana Supreme Court affirmed the conviction and sentence. *Id.* at 249.

January 28, 1980: The Louisiana Supreme Court denied rehearing. *Id.* at 240.

October 6, 1980: The Supreme Court of the United States denied certiorari. *Prejean v. Louisiana*, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980).

December 1, 1980: The Supreme Court of the United States denied rehearing. *Prejean v. Louisiana*, 449 U.S. 1027, 101 S.Ct. 598, 66 L.Ed.2d 489 (1980).

March 31, 1981: Prejean filed an application for state post-conviction relief, raising 12 claims set out in the margin.[1]

---

1. *Claim I:* The proportionality review conducted by the Supreme Court of Louisiana was constitutionally inadequate.

*Claim II:* Petitioner's death sentence was disproportionate and excessive under Louisiana law

April 11, 1981: The Louisiana Supreme Court denied review. *Prejean v. Blackburn,* 397 So.2d 517 (La.1981).

April 13, 1981: Prejean petitioned the United States District Court for the Western District of Louisiana for habeas corpus relief.

September 2, 1981: The district court dismissed for lack of exhaustion.

September 25, 1981: Prejean sought post-conviction relief in the parish of his conviction, raising five claims set out in the margin.[2]

October 5, 1981: The Louisiana Supreme Court denied review. *State ex rel.*

*Prejean v. Blackburn,* 407 So.2d 1189 (La.1981).

February 23, 1982: Prejean filed a second petition for habeas corpus in the United States District Court for the Western District of Louisiana, raising 11 claims set out in the margin.[3]

August 5, 1983: The district court denied Prejean's petition. *Prejean v. Blackburn,* 570 F.Supp. 985, 999 (W.D.La. 1983).

November 18, 1983: The Clerk delivered a letter to all counsel requesting them to study the record and to detail any grounds for relief not already presented, specifically including ineffectiveness of present or former counsel.[4]

---

and the eighth and fourteenth amendments to the United States Constitution.

*Claim III:* The trial court's errors in instructing the jury at the sentencing phase violated Petitioner's eighth and fourteenth amendment rights.

*Claim IV:* The Louisiana death penalty statute violates the eighth and fourteenth amendments because it fails to provide adequate statutory guidance for the jury's consideration of mitigating and aggravating circumstances.

*Claim V:* The exclusion of prospective jurors for cause, solely because they opposed capital punishment, deprived Petitioner of his right to a jury representative of a cross-section of the community.

*Claim VI:* The exclusion for cause of a juror who did not express in unequivocal terms her inability to return a death verdict deprived Petitioner of a fair and impartial jury under the sixth, eighth and fourteenth amendments.

*Claim VII:* The prosecutor's deliberate use of peremptory challenges to exclude blacks from the jury, and the trial court's denial of a continuance or reasonable opportunity for Petitioner to establish that such exclusion was systematic, violated Petitioner's right to a fair and impartial jury under the sixth and fourteenth amendments, and his right to equal protection under the fourteenth amendment.

*Claim VIII:* Petitioner was deprived of a fair and impartial jury when the trial court allowed into evidence two photographs of the victim which were gruesome and inflammatory.

*Claim IX:* The trial court erred in allowing, over Petitioner's objection, the prosecutor to present evidence against the mitigating factor of intoxication during that portion of the trial that dealt solely with aggravating circumstances.

*Claim X:* Louisiana procedures for executing death warrants violate the Louisiana Constitution.

*Claim XI:* The general venire in Petitioner's case was selected improperly under Louisiana law.

*Claim XII:* A stay of execution should be granted until the United States Supreme Court decides *Eddings v. Oklahoma.*

**2.** *Claim I:* The imposition of the death penalty on an individual who was 17 years old at the time of the offense constitutes cruel and unusual punishment.

*Claim II:* The death penalty imposed upon Petitioner was a direct result of intentional racial discrimination.

*Claim III:* The death penalty imposed upon Petitioner resulted from intentional racial discrimination based on the race of the victim and the race of Petitioner.

*Claim IV:* The Louisiana Supreme Court's reliance in affirming Petitioner's death sentence upon hearsay information not before the jury violated Petitioner's due process rights.

*Claim V:* The systematic exclusion of certain persons qualified to serve on the jury denied Petitioner his right to a fair and impartial jury chosen from a cross-section of the community.

**3.** The district court described the claims thus:

Petitioner has raised eleven separate claims for us to consider: (1) the admission of gory photos, (2) the systematic exclusion by the prosecutor of prospective black jurors, (3) the exclusion from the jury venire of a certain socio-economic class, (4) the death qualification of the jury, (5) the exclusion of a prospective juror in violation of Witherspoon, (6) the illegality of the sentencing instructions, (7) the prospective rebuttal of mitigating circumstances, (8) the intentional racial discrimination in the imposition of the death sentence, (9) the limiting of mitigating circumstances, (10) the denial of due process in the affirmance of the death sentence, and, (11) the excessiveness and disproportionality of the death sentence. 570 F.Supp. at 990.

**4.** The text of the letter read:

No later than the day on which this case is set for oral argument, each counsel appearing for a party in this appeal shall, based upon a reasoned and studied professional judgment arrived at after familiarizing themselves with the state court trial and appellate record in

December 1, 1983: State district attorney responds to clerk's letter stating he is aware of no other grounds.[5]

December 5, 1983: Counsel for Prejean responds to clerk's letter stating they are aware of no other claims.

December 6, 1983: At oral argument before this court, counsel are directed to supplement their responses based on future investigation.

January 3, 1984: Counsel for Prejean assert they have begun an investigation to identify any other claims and will promptly pursue them if any are found.[6]

October 15, 1984: This court affirmed the district court. *Prejean v. Blackburn*, 743 F.2d 1091 (5th Cir.1984).

July 15, 1985: This court modified its prior opinion and denied rehearing and rehearing en banc. *Prejean v. Maggio*, 765 F.2d 482 (5th Cir.1985).

July 3, 1989: The Supreme Court of the United States denied certiorari. *Prejean v. Blackburn*, —— U.S. ——, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989).

October 4, 1989: Prejean moved the state court where he was convicted to stay his execution and moved the state trial judge to recuse himself from further consideration of the proceedings.

October 9, 1989: After a hearing, another judge in the parish of conviction denied all relief sought and ordered the case returned to Lafayette Parish where the murder had occurred.

October 16, 1989: The Supreme Court of Louisiana affirmed but ordered an evidentiary hearing on the jury selection

this proceeding, state in writing filed with the Clerk, whether any ground or grounds may be present for asserting error of constitutional dimension, cognizable by a court of the United States in habeas corpus that is not included in the instant cause. If any such ground is known by counsel to exist or thought by counsel to be a possible ground for relief, counsel shall state the ground, the basis for this knowledge or belief, and why it is not now presented.

By the same date, the petitioner and respondent shall state in writing whether to the best of their knowledge any present or former counsel for petitioner has withheld any ground for habeas corpus relief suggested by the petitioner to exist in this cause or in any way failed to represent competently the interests of petitioner in this cause.

**5.** The text of the letter read:

In accordance with the direction of the Clerk of Court, Counsel for Frank C. Blackburn, Respondent, states that although other claims have been made in both State and Federal Court proceedings, which said claims are not urged in the present Writ, it is assumed that said claims are abandoned. Nevertheless, counsel for Respondent feels these claims do not assert error of Constitutional dimension cognizable by a Court of the United States in Habeas proceedings.

Furthermore, counsel for Respondent, to the best of his knowledge, is not aware of any grounds for habeas relief cognizable by a Court of the United States which has been intentionally withheld in the Writ presently before this Honorable Court, but rather that counsel for petitioner recognizes said prior claims to be without merit.

**6.** The text of the letter read:

This letter is in further response to the letter, dated November 18, 1983, of the Clerk of the Court to all counsel of record in this appeal regarding further habeas corpus claims that could be brought by appellant Dalton Prejean. We previously advised the Court that we are not aware of any unasserted claims which would warrant the issuance of a writ of habeas corpus for Mr. Prejean that may now be presented to a federal court.

At the conclusion of the argument of this appeal on December 6, 1983, your Honor instructed us to supplement our prior response within 30 days, based on further factual and legal investigation. We were asked to identify for the Court any meritorious claims, whether or not such claims could be currently adjudicated by a federal court.

As we have previously advised the Court, we had no involvement in this case before September 21, 1983, and, until argument of the appeal on December 6, our efforts had been directed exclusively toward the representation to this Court of the claims raised in Mr. Prejean's pending federal petition. This task was done on an expedited basis.

In accordance with your Honor's instructions, we have begun an investigation to identify claims that warrant presentation to the Louisiana state courts and, should those courts deny relief, to the United States District Court for the Western District of Louisiana. None has yet been identified. As we identify such claims, we shall promptly pursue them in the proper court. If this Court wishes, we can arrange to provide informational copies of any petitions for relief that we file on behalf of Mr. Prejean.

claim raised in plaintiff's most recent application for post-conviction relief.

October 17, 1989: After a hearing, the Lafayette Parish Court denied relief.

October 19, 1989: The Louisiana Supreme Court denied review.

October 19, 1989: Prejean filed his third petition for federal habeas corpus relief, raising 14 claims set out in the margin.[7]

October 27, 1989: The United States District Court for the Western District of Louisiana denied the petition.

November 14, 1989: Prejean appealed that decision to this court and moved for a certificate of probable cause and stay.

## JURY SELECTION

■ *Equal Protection:* Prejean claims that the prosecutor deliberately used the state's peremptory challenges to exclude all blacks from the jury in violation of Prejean's equal protection rights under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Prejean acknowledges that the United States Supreme Court has held *Batson* is not to be retroactively applied to collateral review of the jury's factual determination of guilt in capital cases, but he insists that the Court has never decided whether *Batson* applies retroactively to a jury's capital sentencing determination. While Prejean admits that we have held *Batson* inapplicable to collateral review of sentencing determinations, *see, e.g., Edwards v. Scroggy,* 849 F.2d 204, 206 (5th Cir.1988); *Esquivel v. McCotter,* 791 F.2d 350, 352 (5th Cir.1986), he contends that our precedents must be reconsidered in light of the Supreme Court's recent decision in *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), a case that applied the retroactivity rule from *Teague v. Lane,* —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), to collateral review of capital sentencing determinations. *Penry,* —— U.S. at ——, 109 S.Ct. at 2944. We reject Prejean's contention.

*Teague* had not been decided when this Court concluded that *Batson* does not apply retroactively to the jury's sentencing determination in capital cases. *See Edwards,* 849 F.2d at 204. However, under *Teague,* the jury's sentencing determination in capital cases is treated no different-

**7.** Summary of Claims:

*First,* the Petitioner received ineffective assistance of counsel in violation of his rights under the sixth and fourteenth amendments of the United States Constitution.

Counsel failed to investigate and develop at least five mitigating circumstances:

1. Petitioner suffered from organic brain damage that, coupled with neuropsychological defects, prevented him from controlling his violent impulses.

2. Petitioner's strong feelings for his brother and concern for his brother's safety were a direct result of Petitioner's unstable family life, his abuse by the woman who raised him, and Petitioner's corresponding need for a father figure.

3. By his rough treatment of Petitioner's brother, the trooper provoked the shooting.

4. Petitioner's violent, impulsive tendencies were readily controllable by medication in a structured environment.

5. Petitioner may not have shot Trooper Cleveland if he had not been released without supervision from the Louisiana Training Institute to which he had been committed indefinitely.

*Second,* counsel's failure to present and develop mitigating evidence violated the proscription against arbitrary and capricious sentences.

*Third,* counsel's failure to verify a misleading and incomplete sentence investigation report violated the Petitioner's right to effective assistance of counsel.

*Fourth,* the State's improper manipulation of the proceedings precluded the possibility of an impartial trial.

*Fifth,* the trial court's instructions during the sentencing phase of trial prevented the jury from giving full consideration to the Petitioner's mental retardation as a mitigating factor.

*Sixth,* the prosecutor's use of his peremptory challenges to select an all-white jury violated Petitioner's right to equal protection under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

*Seventh,* the reliability of the jury's determination was undermined by a provision in the Louisiana Code of Criminal Procedure that prohibited the Petitioner from entering an unqualified plea of guilty.

*Eighth,* the execution of a mentally retarded and brain-damaged juvenile violates the proscription against cruel and unusual punishment.

*Ninth,* the Louisiana legislature did not intend to expose a 17–year–old offender to capital punishment.

*Tenth,* the Louisiana Supreme Court affirmed Petitioner's death sentence on the basis of a sentence report that was sealed from the public.

ly from the jury's factual determination of guilt. The standard is whether the rule announced in *Batson* "insists on procedures without which the correctness of the jury's decision to punish by death rather than by life imprisonment is seriously diminished." *Sawyer v. Butler*, 881 F.2d 1273, 1292 (5th Cir.1989). We conclude that it does not.

In *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), the Supreme Court recognized that "other mechanisms existed prior to [the] decision in *Batson*, creating a high probability that the individual jurors seated in a particular case were free from bias." *Id.* at 259, 106 S.Ct. at 2880. The Supreme Court concluded that the new procedures established in *Batson* thus did not have "such a fundamental impact on the integrity of [the jury's] factfinding as to compel retroactive application." *Id.* Because the same protective mechanisms were in place to ensure that the jurors seated in Prejean's case were free from bias, *see, e.g., Prejean*, 743 F.2d at 1102–04, we cannot say that *Batson* has such a fundamental impact on the integrity of the jury's sentencing determination as to compel its retroactive application. We conclude that *Batson* does not apply retroactively to the jury's sentencing determination in capital cases because it does not insist on "procedures without which the correctness of the jury's decision to punish by death rather than by life imprisonment is seriously diminished." *Sawyer*, 881 F.2d at 1292.

*The Sixth Amendment:* Prejean claims that he is entitled to a hearing to determine whether his sixth amendment right to a fair trial was violated by the prosecutor's alleged use of racially motivated peremptory challenges. Prejean argues that such action violates the sixth amendment requirement that the petit jury "provide a fair possibility for obtaining a representative cross-section of the community." *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970). Prejean asserts that the Supreme Court recently granted certiorari to decide this precise issue. We reject this argument.

Prejean's sixth amendment claim was raised, litigated, and rejected on Prejean's prior federal habeas corpus petition. *Prejean*, 570 F.Supp. at 991. The district court determined that Prejean had ample opportunity to substantiate his claim that the state prosecutor used his peremptory challenges in a racially discriminatory manner. The court concluded that Prejean failed to carry his burden of proof. *Id.* We affirmed. *Prejean*, 743 F.2d at 1091. The only difference between Prejean's prior claim and the present one is his assertion that *Batson* should be applied retroactively. We have rejected that contention.

*The Eighth Amendment:* Prejean next argues that discriminatory use of peremptory challenges violated his eighth amendment rights because discriminatory use of peremptory challenges undermines the reliability of the jury's sentencing determination. Prejean claims that his sentence is unreliable because, under Louisiana law, the determination is to be made on the basis of the moral judgment of the community but that the prosecutor's discriminatory use of peremptory challenges created a jury unrepresentative of the entire community. Prejean also claims that white jurors are not as sympathetic as black jurors to mitigating factors offered on behalf of black defendants. Thus, use of peremptory challenges to obtain an all-white jury ensures that mitigating factors will not be given adequate consideration.

We reject these contentions. They merely dress Prejean's equal-protection and sixth-amendment claims in the garb of the eighth amendment. The premises are identical, including the premise that the *Batson* rule should be retroactively applied. *See Prejean*, 743 F.2d at 1102–04 (Prejean failed to carry burden of proving racially discriminatory use of peremptory challenges under the standard of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)).

*The Louisiana Supreme Court's* Batson *Rulings:* Prejean's final claim is that there was no reason for the district court to refuse to try his *Batson* claim on the merits, because the Louisiana Supreme Court

was willing to do so. He asserts that when a state court elects to hear a constitutional claim on the merits, the concerns of comity, finality, and state control which underlie the general rule against retroactivity on collateral review are no longer implicated. Prejean concludes that the district court should have held a hearing on the merits of his *Batson* claim. We disagree.

■ The Louisiana Supreme Court's decision to order a *Batson* hearing was based on the legal assumption that *Batson* applies retroactively to the jury's sentencing determination in capital cases. Our interpretation is that *Batson* does not so apply. A disagreement with a state court's legal ruling which produces a refusal of duplicative review does not risk offending comity or federalism. A contrary view might. The district court was correct in refusing to hold a hearing on the merits of Prejean's *Batson* claim.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Prejean claims that Thomas E. Guilbeau's ineffective representation deprived him of his sixth amendment right to counsel. Prejean cites the following specific deficiencies:

(1) Guilbeau did not present mitigating factors of Prejean's family life such as the rejection he suffered from his mother and his aunt, the physical abuse he suffered from his aunt, and the devotion he held for his brother.

(2) Guilbeau failed to present evidence that Prejean has suffered damage to the front and parietal lobes of his brain which rendered him unable to control his violent impulses.

(3) Guilbeau neither investigated nor presented evidence that Prejean had been diagnosed as suffering from paranoia and schizophrenia.

(4) Guilbeau did not present sufficient evidence of Prejean's intoxication on the night of the shooting.

(5) Guilbeau failed to present evidence of the abusive treatment of Prejean's brother by the state trooper.

(6) Guilbeau did not emphasize to the jury Prejean's age at the time of the shooting.

(7) Guilbeau failed to object to the omission of mitigating evidence from the Sentence Investigation Report.

These same claims have been reviewed and denied by the state of Louisiana in an evidentiary hearing in the Fifteenth Judicial District Court. The claims were also denied by the federal district court.

The gauge for claims of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Briefly stated, "[t]o establish a claim of ineffective assistance of counsel, a defendant must show that his counsel was actually deficient and that he was actually prejudiced by that deficiency." *Hill v. Black*, 887 F.2d 513 (5th Cir.1989) (citing *Strickland*, 466 U.S. at 668, 104 S.Ct. at 2052).

■ *Mitigating Evidence from Prejean's Family:* As both the Louisiana court and the district court held, Prejean's attorney would have taken a tremendous risk by placing members of Prejean's family on the stand to discuss the defendant's past. Although the family members would have testified that Prejean was often quiet, enjoyed church, and read his Bible, on cross-examination they would have been forced to disclose to the jury Prejean's violent tendencies, including an incident where he hit his aunt with a metal tool, bruising her ribs. It is also likely that cross-examination of these character witnesses would have presented to the jury Prejean's prior arrests and convictions, and, most significantly, his adjudication as a delinquent for the murder of a taxi driver.

This claim meets neither prong of the *Strickland* test; counsel's failure to present character evidence through Prejean's family members certainly did not fall below a level of "reasonably effective assistance," *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, *see DeLuna v. Lynaugh*, 873 F.2d 757 (5th Cir.1989), and neither did it cause actual prejudice to Prejean. Realistically, the decision saved Prejean from

the damage which a full examination of his past would have caused.

*Prejean's Mental Condition, Age, and Cognitive Ability:* These claims are foreclosed by an examination of the transcript of the sentencing phase of Prejean's trial. Guilbeau called Dr. William Hawkins to testify as to Prejean's mental condition. Dr. Hawkins testified that he held a Ph.D in psychology from Louisiana State University and a certificate in alcoholism from Yale University and that he was experienced in dealing with both criminal patients and alcoholics. Dr. Hawkins stated that he had performed several I.Q. and personality tests on Prejean. The results of these tests showed that Prejean had an I.Q. of seventy-six and that he performed "at a borderline level of retardation." Dr. Hawkins also testified that alcohol would affect a person of lowered mental ability, such as Prejean, more than it would affect the average person. Later, in his closing argument to the jury during the sentencing phase, Guilbeau argued that the death penalty was not appropriate and did not serve the intent of the Louisiana death penalty statute "in this case at hand where you have a person who functions at the level of a dull mental retard."

In denying Prejean's claims of ineffective assistance, on post-conviction review, Judge Brunson stated that Prejean's youth, mental ability, and state of intoxication were presented to the sentencing jury. He concluded:

> These appear to be the quintessential bench marks of the evidence that might be presented to the jury for them to consider in an attempt to avoid the imposition of the death sentence in favor of a sentence of life imprisonment.

■ We agree with the Louisiana court and with the federal district court that Guilbeau did present sufficient evidence of Prejean's age and mental ability to allow the jury to consider these mitigating circumstances. Given his express request to do so, we assume they did. Although it is possible that Guilbeau could have produced more of the same type of evidence, or even evidence of specific psychological disturbances, such detail is not required by *Strickland.* The psychological and personality tests administered to Prejean can be reasonably understood to reflect any effect any brain damage, neurosis or youth, or all three combined, may have had on his ability to function in society.

*Evidence of Intoxication:* Guilbeau questioned three witnesses as to Prejean's intoxication on the night of the shooting. During the cross-examination of Michael George, who was with Prejean at the time of the shooting, the following exchange took place:

Q. Michael, it's a fact, isn't it, that Joe—that my client, Dalton Prejean, was intoxicated, under the influence of liquor, when all of this went on that you described. Isn't that true?

A. Right.

\* \* \* \* \* \*

Q. It's a fact, isn't it, that when you all left the Harlem [night club] to go and drop Joseph Prejean, his brother,—to drop the girlfriend off, that Dalton Prejean was under the influence of alcohol then? He had been drinking, and he showed it, didn't he?

A. Right.

\* \* \* \* \* \*

Q. Michael Broussard bought a fifth of White Port wine, didn't he?

A. Right.

Q. You divided it equally between the four (4) of you, each an equal portion in a cup?

A. Right.

Q. And, you drank that White Port wine from the Seven/Eleven store in Lafayette ...

A. Yes.

\* \* \* \* \* \*

Q. And the whole time there Dalton Prejean was drinking, wasn't he?

A. Yeah, he was drinking.

Guilbeau's similar cross-examination of Michael Broussard covers fifty-eight pages of the trial transcript. Included is the reading of a transcript from a previous hearing where Broussard detailed the time and

amount of Prejean's drinking on the night of the shooting. Finally, during the sentencing phase of the trial, Guilbeau examined Deborah Thibodeaux as follows:

Q. What, if anything, did you observe about Dalton Prejean when he came into your house that night after twelve o'clock?

A. I can tell you he was under the influence of alcohol.

Q. I want to know if he had anything with him?

A. A cup of beer.

Q. How did his eyes look?

A. Red.

Q. How do they normally look? Are they normally red?

A. No.

The transcript belies any claim that Guilbeau failed to present voluminous evidence of Prejean's intoxication that fatal night. Ineffective assistance of counsel cannot be successfully claimed by Prejean on this count.

■ *State Trooper's Actions:* Prejean claims that Guilbeau should have presented evidence of Officer Donald Cleveland's abusive treatment of his brother. Prejean argues that his deep emotional attachment to his brother, growing out of his unhappy childhood, causes him to lose control of his actions easily whenever his brother is threatened. At trial Guilbeau asked the following questions of Michael George:

Q. You heard the officer arguing with Joseph, didn't you?

A. Yes.

Q. How did that officer sound to you?

A. Mean, because he was cursing.

Q. What effect, if any, did that have on Dalton? Do you know?

A. I don't know what kind of effect it had on him.

MR STANSBURY (prosecuting attorney) I didn't hear your answer.

A. I said that I don't know what kind of effect it had on him. It was his brother. I don't know.

Prejean claims that Guilbeau could have successfully shown that Officer Cleveland pushed Prejean's brother against their car, that the officer used abusive language, and that he unfastened his pistol strap.

The exchange quoted above shows Guilbeau knew of the possibility that Officer Cleveland had handled Prejean's brother roughly. But to present evidence of the effect this may have had on Prejean himself, Guilbeau would have been forced to place family members on the stand or to provide expert psychological testimony of the exceptional fraternal bond. The danger of placing family members on the stand has already been discussed. If Guilbeau had provided expert testimony stating that Prejean killed Officer Cleveland out of concern for his brother, the door would have been opened for the prosecution to impeach that testimony by pointing out that Prejean had previously killed a taxi driver at a time when his brother was in no way involved. This proof was denied to the prosecution by an in limine ruling from Judge Brunson which Guilbeau obtained and protected. The fact that Guilbeau did not press the issue further was not ineffective assistance of counsel. Whether inadvertent or intentional, it was a prudent tactic.

■ *Failure to Object to the Sentence Investigation Report:* Prejean claims that because Guilbeau did not oversee the production of the sentence investigation report which was sent to the Louisiana Supreme Court and because he did not make any objections to the allegedly distorted view of Prejean which that report created, Guilbeau's counsel on appeal was ineffective. Prejean states that the report fails to state that Prejean shot the trooper on impulse, that Prejean had brain damage, that Prejean had an overwhelming impulse to protect Joseph Prejean, his brother, and that Prejean's judgment was particularly marred by alcohol because of his limited mental ability. The report also failed to list several people whom Prejean states would have attested to the value of his life. The failure to object to these deficiencies in the report is alleged to have resulted in representation well below prevailing professional standards.

Assuming arguendo that Guilbeau bore a professional responsibility to check the con-

tents of the sentence investigation report for accuracy and to object to any flaw he found therein, we cannot agree with Prejean that he suffered prejudice in the Louisiana Supreme Court's review of his case due to the absence of any of the information listed above. Much of this information was known to the Supreme Court from the trial record. The court was aware of Prejean's family background, his limited mental ability as shown by at least three batteries of psychological tests, and his resultant low tolerance of alcohol. *Prejean,* 379 So.2d at 247–49.

The Louisiana Supreme Court reviews every death sentence to determine if it is excessive. LA.CONST. art. 1, § 20; C. Cr. P. 905.9. The review exercised by the court has three parts:

> In deciding whether a death sentence is excessive we must consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's finding of a statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*Prejean,* 379 So.2d at 247. The lack of information of which Prejean complains would affect only one part of the third step of this analysis. The Court stated: "The record will not support a conclusion that defendant's capacity to appreciate the criminality of his conduct was so impaired because of his mental condition and intoxication and that the death sentence was, for that reason, excessive." *Id.* at 249. We do not believe that the Supreme Court's lack of the additional information which Prejean now complains was omitted, raises "a reasonable probability ['a probability sufficient to undermine confidence in the outcome'] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

The trial transcript has been twice-combed by the state post-conviction trial court, the Louisiana Supreme Court on direct and post-conviction review, the United States District Court, this court, the Supreme Court of the United States, and by three different groups of attorneys representing Prejean. Over the course of twelve years, no intimation of less than fully effective representation by Guilbeau was suggested by anyone until present counsel recast the substance of prior claims as constitutional ineffectiveness.

This is a case filled with ironies, not the least of which is the claim that the State of Louisiana is at fault for releasing Prejean from juvenile detention too soon after he murdered the cab driver. But, the greatest irony is that present counsel secured an affidavit from Guilbeau which recites a litany of "I-did-nots" and "In-hindsight,-I-should-haves;" and that in his recent testimony he felt it necessary to say, "I wish I could have done better." This self-deprecation by Guilbeau is both uncalled for and inaccurate. The reason Dalton Prejean faces death at the hand of the State of Louisiana is because he murdered a peace officer of that state who stopped his defectively lighted car while he was driving drunk. Killing an officer who is in the process of taking a drunken driver off the highways has got to be one of the hardest of all crimes to defend. Guilbeau's own affidavit goes far toward confirming this. He swears that when he began to learn the facts, he quickly concluded that "any defense in the guilt-innocence phase of trial would be futile."

Guilbeau's defense of Dalton Prejean was far more than adequate. Even hindsight second-guessing about what he might have done or left undone fails to demonstrate that he could have changed the outcome for his guilty client. No constitutional error is presented by this claim.

## THE RETARDATION–YOUTH ARGUMENT

Prejean's argument that the death penalty as applied to him is cruel and unusual punishment is urged as novel because he was both mentally retarded and seventeen years old. Prejean concedes that under *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), mental retar-

dation alone is not an absolute bar to the death penalty. However, he argues, neither this court nor the Supreme Court has considered such a case where the defendant was both mentally retarded and seventeen years of age.

Prejean is not "mentally retarded" as that term is defined by the American Association on Mental Retardation as one with an I.Q. of seventy or below. At trial, Prejean's expert testified that he tested as having a full scale I.Q. of seventy-six and was thus "border-line mentally retarded."

Assuming arguendo that Prejean should qualify as a mental retardate, his argument is still not well taken. *Penry* states: "So long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination of whether 'death is the appropriate punishment' can be made in each particular case." — U.S. at ——, 109 S.Ct. at 2958.

Prejean no longer argues that the jury in his case was improperly instructed as to the mitigating effect of his mental ability. The jury was informed by the defendant's expert of the precise professional assessment of his mental capabilities. After having a full opportunity to consider how to balance Prejean's mental capability and his crime, the jury decided that the death penalty was appropriate in this particular case.

■ But Prejean asks that we combine the separate weights of two eighth amendment claims as one. He contends that a special assessment must be given the imposition of the death penalty where the murderer is both young and "border-line mentally retarded." We disagree. The Supreme Court held in *Stanford v. Kentucky,* — U.S. ——, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), that the eighth amendment does not prohibit the execution of sixteen and seventeen year old defendants who have been convicted of capital murder.

In Prejean's case, there was added assurance that the imposition of the death penalty resulted from guided discretion of a jury. Two conditions had to be met before the death penalty could be imposed. First, the defendant must be convicted and sentenced to death based upon the jury's assessment of his overall mental capability under the safeguards outlined by *Penry.* Second, he must have met the requirements set by Louisiana for undergoing trial as an adult.

The Court in *Stanford* outlined two considerations for imposing the death penalty on sixteen and seventeen year olds. The first was whether the drafters of the Bill of Rights regarded the execution of such defendants as cruel and unusual. The second was whether a consensus existed in the national society toward executing defendants of that age. — U.S. at ——, 109 S.Ct. at 2974–75. The Court, after determining that there was no national consensus on the subject, held that neither of these considerations prompted the determination that the execution of defendants of such age would be cruel and unusual.

In the absence of a national consensus against executing sixteen and seventeen year olds, the ultimate consideration in determining whether a certain mentally retarded defendant or a certain sixteen or seventeen year old can be put to death under the eighth amendment becomes the same. It is whether the particular defendant had such mental capability that he should be held accountable for his actions. That determination was clearly put before Prejean's jury. In Louisiana, a defendant can be tried as an adult if he commits a capital felony at the age of seventeen or above. La.Const. art. 5, §§ 16, 19. It is not disputed that Prejean was seventeen years old when he murdered Officer Cleveland. When a defendant is both mentally retarded (or border-line mentally retarded) and seventeen years of age, no new constitutional assessment of the propriety of the death penalty is necessary if his jury could consider the combined force of both claims. That was true here.

The imposition of the death penalty in his case does not violate the eighth amendment.

## STATE CONTROL

Prejean contends that the state exercised improper control over several crucial as-

pects of the trial proceedings, which deprived him of a fair, impartial trial. Specifically, he claims: the prosecutor handpicked the jury who heard the case; in granting Prejean's request for a change of venue, the judge improperly chose predominantly white and racist Ouachita Parish which had a notorious recent history of discrimination; the judge chose to continue presiding over the case despite the fact that he had transferred it out of his own parish; and the prosecutor had improper ex parte communications with the judge. In addition, Prejean claims that no adequate evidentiary hearing has been held on these issues. We reach this last issue first.

*Hearing:* Prejean moved to recuse trial judge Brunson as the judge in his latest state post-conviction proceeding. Judge Joyce held an evidentiary hearing on his motion at which Defense Counsel Guilbeau, District Attorney Stansbury, and Judge Brunson testified. Relying upon the evidence taken at the recusal hearing, the United States District Court refused to grant Prejean an additional evidentiary hearing on the habeas corpus issues he raised there.

█ A district court must hold an evidentiary hearing on factually disputed constitutional issues if adequate, relevant evidence does not appear in the state court record. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); 28 U.S.C. § 2254(d).

█ Prejean argues that the district court erred by basing its evaluation of these state control issues on the recusal hearing record. He contends this was error because the facts adduced were in response to a recusal motion, not to a challenge that the trial was not impartial. Prejean asserts that neither Judge Joyce in the recusal hearing nor the district court in the instant habeas proceeding has properly passed on these issues and that the Louisiana Supreme Court merely affirmed Judge Joyce's denial of the motion. Therefore, no court has adequately developed the evidence on these claims. We disagree.

The State correctly points out that Prejean's present claims are identical to the issues developed in the recusal hearing. Therefore, no new evidentiary hearing was necessary.

*Judge–Picking:* The first of the three witnesses who appeared at the recusal hearing, Thomas E. Guilbeau, was Prejean's trial counsel. The second was District Attorney Nathan Stansbury, and the third was Trial Judge Hugh E. Brunson. Each of the three attempted to recollect the manner in which the case was tried by Judge Brunson twelve years ago. Guilbeau had no direct knowledge about how trial judge selection was made, but he described his attempts to get an affidavit concerning the procedure from a deputy clerk and testified to what he had been told. Stansbury and Brunson testified there was no prosecutorial selection. Each of the three testified concerning the defense motion for a change of venue and as to the judge's expressed reasons for choosing Ouachita Parish. Each of the three described their recollections about whether judges often, occasionally, or never go to the transferee district to try a case on a change of venue. Judge Brunson stated the reason for his request to the Court Administrator to follow the case. The judge and district attorney described the judge's frequent practice of communicating with attorneys on both sides. Guilbeau testified to his lack of contemporaneous knowledge of a call by the judge to the district attorney disclosing a legal argument which had evidently been made by Guilbeau to the judge at a time when the district attorney was not present. The examinations and cross-examinations were thorough and clearly appear to have exhausted each witness's knowledge of the subjects covered. Although ostensibly concerned with recusal, the evidentiary hearing covered every point now raised on this appeal concerning the trial events of twelve years ago. No further hearing was required to enable the state courts and the district court to fully and fairly consider and rule on these issues.

Prejean notes that the due process clause guarantees criminal defendants an impartial trial and that, when the judicial and prosecutorial functions merge, impartiality

disappears. Based on these axioms, Prejean alleges that the district attorney's office "handpicked" Judge Brunson, a former assistant district attorney, to try the case, thereby merging the judicial and prosecutorial functions.

At the recusal hearing, defense attorney Guilbeau stated that a deputy clerk told him that the district attorney's office controlled the docketing of the case and in that manner had picked Judge Brunson, but the clerk declined to sign an affidavit to that effect. The district attorney categorically denied that he or anyone from his office picked Judge Brunson to try Prejean's case. Both the district attorney and the judge surmised that routine clerk's office procedures had caused the selection of Judge Brunson because he was the only judge then on the court who was trying criminal cases full time.

The district court found from the record of the recusal hearing that Prejean's allegations were completely unsubstantiated, and that there was no indication that the prosecution did not follow Louisiana law.

Prejean contends here that even if the normal procedures were followed, those procedures themselves did not ensure the impartiality required by due process based on *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

In *Tumey,* the defendant was tried and convicted by the mayor of the town who, by statute, earned extra money if he convicted the defendant. The Court held this to be an unconstitutional merger of the judicial and prosecutorial functions. Prejean's case is unlike *Tumey.* Judge Brunson had no monetary interest in the outcome of the trial. He had no connection with the district attorney's office after his election as a judge. The finding that the method of his selection did not violate due process is supported by an adequate record.

■ *Venue Choice:* Prejean contends that Ouachita Parish had a notorious recent history of racism and discrimination and that the "arbitrary" transfer of the case there denied him an impartial trial. He cites a 1978 federal district court case where the court referred to the county as

historically and systematically discriminatory toward blacks. At the recusal hearing the judge testified that the trial was moved to Monroe to get as far away from Lafayette as possible. Shreveport had been considered first but was unavailable because of courtroom construction. Based on the testimony at the recusal hearing, the district court found Prejean's claim conclusory and unsubstantiated.

The judge's testimony is sufficient to show that the decision was not arbitrary. Prejean offered only conjecture to the contrary. He does not say that the judge purposefully transferred the case to the Ouachita Parish because of its reputation. No proof was offered to show the selection prejudiced Prejean's trial. The district court was correct in rejecting this claim on this record.

■ *Transfer Judge:* Prejean claims that it was unusual for a judge to stay with a case after transferring it. The obvious inference he intends this court to draw is that a biased Judge Brunson wished so strongly to convict Prejean that he moved with the case to ensure that result. Judge Brunson testified that he followed the case because he did not wish to inconvenience the receiving jurisdiction and because he thought it was the usual practice in cases that would be difficult to try. Apparently in response to Prejean's claim that the transfer was unusual, the judge produced statistics from the Louisiana court system indicating that while not routine, judges do follow cases.

Based on Judge Brunson's plausible explanation, the lack of evidence supporting Prejean's implication, and the transcript of the trial, the district court was correct in finding that conclusory allegation raised no substantial constitutional issue.

■ *Ex Parte Communications:* Prejean's final allegation here is that research memoranda from Judge Brunson's office relating to the admissibility of Prejean's prior juvenile murder conviction, dated before the judge ruled on the issue, were produced from the district attorney's files during discovery. Another document from

the district attorney's files establishes that Judge Brunson had informed the district attorney of Prejean's doctor/lawyer jury selection claim before it was made and revealed the cases Guilbeau had cited to the judge. The judge testified that it was his usual practice to share research with both sides so they would be better prepared for litigation. The state courts and the district judge accepted this explanation and we affirm that ruling.

Prejean asserts that he is at least entitled to a further evidentiary hearing to develop how these documents came into the prosecutor's hands. Assuming that they got there directly from the judge, the court's agreement with the judge's explanation eliminates any constitutional defect and any need for a further hearing.

### ABUSE OF THE WRIT

 The chronology set out above makes it clear that able, ardent counsel for Prejean now seek to present issues that have or should have been litigated long ago. The "new" developments they urge formed parts of the basis for former decisions of the trial and appellate courts of Louisiana and the United States in these enduring proceedings. There comes a time when even death penalty litigation must end, and it now has been reached in this case. We have dealt with the merits of each of the four contentions raised before us here. For sake of complete adjudication, we also deny habeas corpus relief for abuse of the writ. *See* 28 U.S.C. § 2244(a); Rule 9, Rules Governing Section 2254 Cases in the United States District Courts. *See Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).

Rule 9(a) covers delayed petitions. This circuit has held that no matter how long the delay may be, a particularized showing of prejudice is required. *Marks v. Estelle*, 691 F.2d 730 (5th Cir.1982). The State has attempted no such showing here. Rule 9(a) does not apply.

Consideration of Rule 9(b) produces a different outcome. Under that part of the Rule, a second or successive petition may be dismissed where the first petition has been dismissed on the merits and any new and different grounds alleged in support of the repeated petition should have been asserted in the prior petition. As the Committee Notes to Rule 9(b) make clear, " '[N]othing in the traditions of habeas corpus requires a court to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is ... to delay.' " (Quoting *Sanders*, 373 U.S. at 18, 83 S.Ct. at 1078.)

 The burden is on the State to assert abuse of the writ. It has done that here. The burden then shifted to Prejean to prove by a preponderance of the evidence that he has not abused the writ. *Daniels v. Blackburn*, 763 F.2d 705, 707 (5th Cir.1985). Prejean has failed to meet this burden.

Counsel now seeks to avoid abuse of the writ by contending that new facts have been discovered which warrant further collateral attacks. This claim is belied by the record. Every "new" fact asserted was either plainly apparent on the face of the record or could have been discovered by reasonable diligence. Counsel's effort to put a new face on these old facts through the proffer of current affidavits is a transparent device that has no merit.

In view of this court's request to counsel to seek out any issues not raised and counsel's responses that they had done so and found none, the repetitious, successive grounds now urged and the failure to promptly make the "new" discoveries the subject of litigation constitute a clear abuse of the writ of habeas corpus under the precedent of this circuit. *See Jones v. Estelle*, 692 F.2d 380 (5th Cir.1983); *Jones v. Estelle*, 722 F.2d 159 (5th Cir.1983) (en banc), *cert. denied*, 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984); *Autry v. Estelle*, 719 F.2d 1251 (5th Cir.1983).

### CONCLUSION

To date, 11 different lawyers have represented Prejean in the processing of 20 legal proceedings in 6 different courts before 35 different judges. The matter is being considered by this panel for the third time.

The Supreme Court has declared that states may constitutionally provide death as a penalty for especially reprehensible murders. Louisiana chose to provide that the penalty could be applied for killing a peace officer in the line of duty. There is no doubt whatsoever that Dalton Prejean committed such a crime, nor is there any longer a doubt that he was constitutionally convicted of doing so. It is time to let justice be done.

The motion for a certificate of probable cause and stay of execution is DENIED.

JOHNSON, Circuit Judge, concurs in the result, only.