# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 16-143

STATE OF LOUISIANA

VERSUS

LLOYD RICHARDSON

\*\*\*\*\*\*\*\*\*\*\*\*

**APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, DOCKET NO. 13-K-5762-A
HONORABLE JAMES P. DOHERTY, JR., DISTRICT JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

**JAMES T. GENOVESE
JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of James T. Genovese, Phyllis M. Keaty, and David Kent Savoie, Judges.

**AFFIRMED.**

**Chad Ikerd
Louisiana Appellate Project
Post Office Box 2125
Lafayette, Louisiana 70502
(225) 806-2930
COUNSEL FOR DEFENDANT/APPELLANT:**
    **Lloyd Richardson**

**Earl B. Taylor, District Attorney**
**Jennifer M. Ardoin, Assistant District Attorney**
**Twenty-Seventh Judicial District**
**Post Office Drawer 1968**
**Opelousas, Louisiana 70571-1968**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GENOVESE, Judge.**

In this criminal case, Defendant, Lloyd Richardson, was convicted by a jury of armed robbery and possession of a firearm by a convicted felon. He later filed a Motion for New Trial, which was denied. He appeals the denial of his Motion for New Trial relative to his convictions, alleging victim recantation that he was the robber. For the following reasons, we affirm the trial court's denial of Defendant's Motion for New Trial.

## FACTS AND PROCEDURAL HISTORY

The victim, Fletcher Duplechain,[1] was robbed at gunpoint during the early morning hours of December 10, 2013. Mr. Duplechain identified Defendant in a photographic line-up as the person who robbed him and later identified him at trial. After his convictions for both armed robbery and possession of a firearm by a convicted felon, Defendant filed a Motion for New Trial and a Motion for Judgment of Acquittal wherein he submitted an affidavit and testimony from the victim that he was not certain Defendant was the person who held a gun to him. The trial court denied both motions, and Defendant has appealed the denial of his Motion for New Trial.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. We note an error patent relative to the trial court's sentence for possession of a firearm by a convicted felon. Louisiana Revised Statutes 14:95.1 mandates a fine upon conviction for that offense of not

---

[1] Though the bill of information spells the victim's last name "Duplechan," the transcript and brief say "Duplechain;" therefore, we will refer to the victim as "Duplechain" in this opinion.

less than one thousand dollars, nor more than five thousand dollars. This mandatory fine was inadvertently not imposed by the trial court, thereby rendering the sentence on this offense illegally lenient. However, because the issue of an illegally lenient sentence was not raised on appeal, we do not address same.

## ASSIGNMENT OF ERROR

In his sole assignment of error, Defendant contends the trial court erred in denying his Motion for New Trial based on Mr. Duplechain's recantation of his eye-witness identification of Defendant as the person who robbed him.

## DISCUSSION

*Evidence at Trial*[2]

Officer Bowman Bob with the Opelousas Police Department (Officer Bob) responded to an armed robbery call on December 10, 2013. The call came sometime between 3:30 and 4:00 that morning. Based on his interview with the victim, Mr. Duplechain, Officer Bob began looking for the vehicle described as being involved in the robbery. During his search, Officer Bob was flagged down by a second armed robbery victim, Patrick Layssard. Based on the vehicle descriptions given by both victims, Officer Bob continued his search and eventually spotted a vehicle matching the victims' descriptions. Officer Bob pulled in behind the vehicle and activated his lights and siren. The vehicle did not slow down and actually began to speed up. Officer Bob activated his horn several times in an effort to get the vehicle to stop.

---

[2]Although sufficiency of the evidence is not challenged on appeal, the evidence introduced at trial is pertinent and necessary to review Defendant's assigned error relative to his Motion for New Trial. Thus, we will set forth the evidence at trial.

When the vehicle finally began to slow down as if it was going to stop, Officer Bob shined his spotlight directly at the back of the vehicle. He estimated that he was approximately ten yards "right behind the vehicle," at which time he noticed a "silhouette from the rear, driver's side of the vehicle cross over." Because the windows were tinted, he could not see exactly who the person was. According to Officer Bob, the silhouette threw an object onto the side of the roadway. The other people in the car—the driver, the passenger, and the rear passenger—never moved. The vehicle moved another thirty to thirty-five yards before it came to a complete stop.

When the vehicle stopped, Officer Bob saw the rear, driver's side door open, and a black male subject exited and took off running. His spotlight was still on, and Officer Bob began chasing the subject on foot. He caught up with the subject, detained him, and walked him back toward the police unit and parked car. When he and Defendant returned to the vehicle, the other people in the vehicle—Harold Hughes, Alonza Levier, and Meghan Simms—had been detained by another officer that had arrived on the scene. During his testimony, Officer Bob identified Defendant in court as the person he chased, caught, and detained. When asked if he was able to determine where everyone was sitting in the vehicle, Officer Bob said Mr. Hughes was passed out on the rear, passenger side seat; Mr. Levier was in the driver's seat; and, Ms. Simms was in the front, passenger seat.

After placing Defendant in the police car, Officer Bob and another officer began looking for the object that was thrown out of the vehicle. Based on Officer Bob's description of the area, they were able to locate a black firearm, and Officer Bob stated that the gun was found in the grassy area where he saw the object being thrown from the vehicle. When the gun was found, there was a round in the

3

chamber, ready to be fired, and the magazine was fully loaded. Officer Bob identified State's Exhibit 1(A) as the gun that was found.

Back at the station, Officer Bob prepared a photo line-up with six photos containing individuals that resembled Defendant and a photo of Defendant. The victim of one of the robberies, Mr. Duplechain, positively identified Defendant, Lloyd Richardson, as the person who robbed him at gunpoint. Officer Bob testified that the photo identification was made the same day as the robbery. When asked if he presented any other photo line-ups to Mr. Duplechain, Officer Bob stated that he presented a photo line-up of the other three people in the vehicle. At that time, Mr. Duplechain identified the driver, Mr. Levier, as the person who asked him for a lighter. He was not able to identify the other two passengers in the vehicle.

During cross-examination, Officer Bob acknowledged that one of the victims, Mr. Layssard, identified Mr. Hughes as the person who robbed him. He also acknowledged that he did not "really know" who threw the object out of the vehicle's window:

A.      No, sir. All I - - what I advised was I seen the silhouette of the subject cross over and throw something out the window. I didn't know exactly who it was at the time.

Q.      So it's perfectly, completely, and absolutely possible that it's Harold Hughes that threw that gun out the window?

A.      No, sir, 'cause I seen the silhouette of that person throw an object - - not saying it was a gun, throw an object out of that window.

Q.      But you just said you don't know who that person was and that the windows were tinted.

A.      I did not.

Q.      And you can determine who that silhouette was and you know for sure that it was him?

4

A.    I explained to you I did not know the identification of the subject. I only seen the silhouette of the subject in the rear, driver's seat.

Q.    But there's no possibility whatsoever it was Harold Hughes that threw the it [sic] out?

A.    I'm not saying that it wasn't, but I'm just stating that I seen the silhouette of a subject throw something out of the window.

When asked if it was possible that one of the other passengers disposed of the weapon in question while Officer Bob was chasing Defendant, the officer replied, "Yes, sir. It's possible."

On re-direct, the following colloquy took place regarding what Officer Bob saw:

Q.    And you said that you saw a silhouette of the person sitting in the passenger - - in the back seat, behind the driver - - the silhouette of that person reach over and throw something out of the window - - which would have been the passenger's side, rear window, and who exited - - when the vehicle finally stopped, who exited out of the rear, driver's side passenger door?

A.    The rear, driver's side passenger door, Mr. Richardson.

Q.    The defendant?

A.    Yes, sir.

Patrick Layssard testified that he was the victim of an armed robbery in December 2013. He stated that he was walking between 11:00 p.m. and midnight when a tan Tahoe pulled up beside him. A brown-skinned young man with a gun exited the rear, passenger side door and demanded that he give him the cash on him. Mr. Layssard described the guy driving as a "little skinny guy" and stated that there was a girl in the front, passenger side. Mr. Layssard testified that the windows were down, and he did not see Mr. Richardson in the vehicle. When

5

asked if he knew Lloyd Richardson, Mr. Layssard replied, "I went to school with him."

According to Mr. Layssard, State's Exhibit 1(A) was not the gun "the guy had." Mr. Layssard further testified that the guy who robbed him had a strap on his gun, and the gun was long. He stated he was certain there were only three people in the vehicle and that Defendant was not one of them.

Mr. Duplechain then testified that he was the victim of an armed robbery on December 10, 2013. He stated he was walking to work between 3:30 and 4:30 that morning when a truck stopped, and the driver asked him for a light. Mr. Duplechain described the truck as a brownish or dark green Tahoe or Yukon SUV. He told the driver that he did not have a light, but gave the driver a light off of the cigarette he was smoking. At that time, someone exited the back, passenger side of the vehicle, came around the vehicle, put a gun to his head, and asked for his money. The robber dug in his pockets and pulled out some quarters, his debit card, and his identification. After returning the debit card and identification, the robber took the change and got back into the back, driver's side of the vehicle. When asked how he knew the robber got back into the driver's side, rear door, Mr. Duplechain responded, "I watched him get into it."

When shown State's Exhibit 1(A), Mr. Duplechain stated, "I'm sure that's the gun - - the weapon that was pointed at me." He testified that he had a close glimpse of the gun. Mr. Duplechain acknowledged that although he told police the gun was gray, it is not gray. He explained that he thought the gun was gray because of the way the paint was faded at the end of the "[m]uzzle." He further testified that the robber told him he needed money to buy Christmas presents for his children. Later on the day of the robbery, Mr. Duplechain was shown a photo

line-up and circled the photo of the man who robbed him. Mr. Duplechain identified Defendant in court as the person who robbed him and stated that he was sure Defendant was the robber. He further testified that the photo he circled in the photo line-up was a photo of the same man that he identified in the courtroom, Lloyd Richardson. On re-direct, Mr. Duplechain again stated the photo he circled in the line-up was a photo of Defendant.

Mr. Duplechain also testified that there were three other people in the vehicle; however, he only described two other people: "the one that got out the vehicle and robbed me, the driver, and the young lady." When asked if he was able to identify any of the others in the vehicle, he answered, "Um, I identified the driver 'cause we was, like, maybe two feet away from one another."

On cross-examination, Mr. Duplechain acknowledged that he has worn glasses most of his life, that he is nearsighted, and that he "can only see close up." He also told defense counsel that he remembered everything like it was yesterday and that the whole event lasted "maybe, ten minutes." When he was shown a photo of Mr. Hughes, another person charged with armed robbery, Mr. Duplechain stated that he did not remember if he was shown a photo of Mr. Hughes in the photo line-up.

The following colloquy took place regarding the fact that Mr. Duplechain did not mention a unique physical feature of Defendant in his statement to police:

Q.    If you take a look at Mr. Richardson, he's got a unique physical feature.

A.    Uh-huh.

Q.    Can you tell the jury what that unique physical feature is?

A.    He has one eye.

7

Q. You know what's missing from your statement, Mr. Duplechain?

A. What's that.

Q. You never say in the statement that he only had one eye. Are you aware of that?

A. Yes, I am. That's not in my statement - -

. . . .

A. I did not - - I did not put that in my statement[,] but I did mention it to the officer.

Q. Now, you hand wrote a statement though, correct?

A. Yes, I did.

Q. You did not put it in that handwritten statement, did you?

A. No, I did not.

Q. Don't you feel - - withdraw the question. That's kind of a unique detail to leave out, don't you think?

A. Yeah, come to think of it - - now that you mentioned it, it is.

Defense counsel then questioned Mr. Duplechain as to whether Mr. Hughes could have been the robber instead of Defendant:

Q. Sure, okay. Thank you. You heard the testimony of Mr. Layssard earlier.

A. Uh-huh.

Q. He identified Mr. Hughes as the guy that was robbing people.

A. Uh-huh.

Q. Is it possible that - - and please understand me, I'm not accusing you of doing this on purpose, is it possible that kind of like you confused the gray and the black, and kind of like you forgot the fact that the perp - - alleged perpetrator had a missing eye, is it possible that you missed a couple of things and you're just slightly confusing Harold Hughes[,] who was drunk[,] and who has children[,] and who actually robbed you[,] with Lloyd Richardson[,] who may or may not have been in the vehicle?

8

A.     No.  I can't - - I'm not confusing it because when I looked at him, past the gun, the one eye is what caught my attention and like I said, I just didn't mention it in my written statement but I did mention it to the officer.

When asked to explain why he described the Tahoe as brown or green when every other witness described it as tan or brown, Mr. Duplechain stated that when he had his hoodie on, he could not see that clearly.  He testified that he took his hoodie off when he turned to look at the robber.  When asked about the lighting, Mr. Duplechain testified that there was a street lamp maybe ten feet away from him, that it was dark at that time of the morning, and that the skies were cloudy.

On re-direct, the State asked Mr. Duplechain if he was sure Mr. Hughes was not the guy who robbed him.  Mr. Duplechain responded, "Yeah, I'm pretty sure that's not the robber."  He stated he had good vision when he wore his glasses and that he was sure Defendant was the person who robbed him:

Q.     And as you sit right here, today, having identified that man as the man that robbed you the same day as the robbery - -

A.     Uh-huh.

Q.     - - but looking at him again today, you're positive that that's the guy that robbed you on December 10th - -

A.     Yes.

Q.     2013?

A.     Yes.

Q.     No doubt in your mind?

A.     No.

Q.     Even considering the seriousness of this charge?

A.     Yes.

9

Officer Brandon Harris (Officer Harris) with the Opelousas Police Department testified that he responded when Officer Bob radioed that he was attempting to stop the vehicle suspected of the armed robberies. When Officer Harris approached the stopped vehicle, Officer Bob was in foot pursuit of the individual that ran, and there were three individuals still in the vehicle. He stated there was a male in the back, behind the passenger's seat, the driver, and a female in the front passenger seat. The driver of the vehicle exited the vehicle and began approaching him. He knew all of the individuals in the vehicle—Alonza Levier, Meghan Simms, and Harold Hughes.

Officer Bob then returned from his foot chase with Defendant and told Officer Harris that an object had been thrown from the vehicle. Following Officer Bob's instructions on where to look for the discarded object, Officer Harris stated that he found a gun in the grass area next to the road.

Later, Officer Harris presented a photo line-up to Mr. Layssard, the other robbery victim. In the photo line-up, Mr. Layssard identified Mr. Hughes as the person who pulled a gun on him and tried to rob him. Officer Harris remembered Mr. Layssard describing the gun as being black.

On cross examination, Officer Harris testified that Mr. Hughes appeared to be under the influence of some type of substance. Officer Harris also read from his report in which he stated that Meghan Simms identified Mr. Hughes as the person who robbed Mr. Layssard. According to Officer Harris, Mr. Hughes told him that he heard Ms. Simms speaking with Defendant and Mr. Levier while they were in jail about needing to get their stories straight before they were interviewed by police.

In his testimony for the defense, Alonza Levier testified he pled guilty as a result of the December 10, 2013 robberies. He stated that Defendant was not in the car during the robberies and had nothing to do with the robberies. Mr. Levier later testified that Defendant got in the vehicle after the robberies. Mr. Levier also denied seeing the weapon in the car that night.

*Evidence at the Motion for New Trial Hearing*

At the hearing on the Motion for New Trial, defense counsel introduced the testimony of Mr. Duplechain, the victim of the armed robbery for which Defendant was found guilty. Mr. Duplechain stated that after trial, he was approached by Defendant's family about signing an affidavit, which Mr. Duplechain skimmed over and signed. The following colloquy took place regarding the affidavit:

> Q.    Okay, so when you signed this sworn document, you knew what you were essentially attesting under oath that you did not tell the jury the truth during the jury trial?
>
> A.    Actually, I did tell the truth. I just - - after re-thinking everything, I realized I had probably had made a mistake.
>
> Q.    So, you're saying that when you went in front of the jury and you said that defendant robbed you, you, after re-thinking it - -
>
> A.    Not after re-thinking it - - how I could say it - - uh, after further consideration and re-think - - re-thinking everything, yes, I probably had made a mistake.
>
> Q.    So, you're saying your testimony at Lloyd Richardson's trial was mistaken?
>
> A.    Yes.
>
> Q.    So, when you ID'd Mr. Richardson as the guy who robbed you, that was a mistaken identification?
>
> A.    Yes, it was a mistaken identification.
>
> Q.    Okay, why – well, then why did you say it was him?
>
> A.    'Cause[,] at that time[,] I was sure it was.

Q.     And now you're not sure it was?

A.     No, now - - now, I'm not sure.

When asked if anyone threatened him or bribed him into signing the affidavit, Mr. Duplechain replied, "Not really[;]" and, when asked if his change in testimony was of his own volition, he answered, "Yeah."

Defense counsel specifically asked Mr. Duplechain if Defendant was the guy who robbed him on the night in question. He replied, "No." Mr. Duplechain explained, "[A]fter further consideration, I - - I believe I made a mistake."

On cross-examination, Mr. Duplechain acknowledged that in 2013, he identified the person who robbed him in a photo line-up. When asked if he was in a better position in 2013 than two years later, Mr. Duplechain replied, "I was in a better position then, in 2013." He agreed that his memory in 2013, soon after the incident, would be better than two years later, in 2015. He also stated he would not have completed the affidavit if he had not been approached by Defendant's sister. With regard to any threats or bribes Mr. Duplechain may have received, the following colloquy took place:

Q.     The other attorney asked you some questions. He says, "Did anybody bribe you or anybody threaten you?" and you said, "Not really."

A.     Uh-huh.

Q.     You had a unique choice of words, "Not really." Explain to me what is "not really."

A.     You know, couple things were said and stuff, you know, but nothing - - not real threat threats, you know, just little things were said.

Q.     That's what I want to talk to you about, those little things[,] and I understand that, you know, you - - there's things that you feel you

can handle, but let's talk about specifically what little things occurred and happened that made you feel uncomfortable.

A.     Uh, she told me that her brother was - - was - - had got beat up in - - in lock-up and stuff.  Different - - little, you know, little things like that.

Q.     How did that make you feel?

A.     Kinda made me feel bad, you know, but - -

Q.     Bad for him?

A.     Yeah.

Q.     You wish that you could help him out with - - with being in jail?

A.     Yeah, kinda.

When specifically asked if he completed the affidavit because he wanted to give Defendant a break rather than because Defendant was not the robber, Mr. Duplechain answered, "No, not so much as get a break.  It's just like I said, I, uh, as I thought about things, I think I may have made a mistake."  Mr. Duplechain explained further that although he was not saying Defendant was not present, Defendant may not have been the one holding the gun.  When asked if it was possible that Defendant was the person holding the gun, Mr. Duplechain replied, "It's possible[,]" but he was not sure.

Mr. Duplechain stated that in addition to telling him that Defendant had been beaten in jail, Defendant's sister also told him that another witness was supposed to testify on Defendant's behalf:

A.     Um, if I'm remembering straight, I think she had told me that, um, somebody else was supposed to testify[,] and they was missing the woman that was at the scene, that she was missing[,] and she was supposed to testify for Lloyd[,] and she wind up recanting her statement, too, and testifying against him.

13

Q. So she told you that there was some witnesses who were supposed to prove that it was not him and that for some reason changed their testimony?

A. Yeah.

When asked if he was offered anything in exchange for recanting his identification, Mr. Duplechain replied, "No, not really. She bought me a phone card, that's about it." He said that a friend of Defendant's sister brought him to a notary, that Defendant's sister paid the notary, and that the affidavit was already prepared when he arrived at the notary. When asked if the words in the affidavit were his words, Mr. Duplechain said they were not his words. Specifically, Mr. Duplechain testified as follows:

Q. You remember Mr. Fuselier asked you about paragraph three or he called it item three and item four?

A. Uh-huh.

Q. It says specifically, item three says, "In that trial, he incorrectly identified Lloyd Richardson as the person who robbed him and wishes to recant his testimony." You never told the person who prepared this document to say that specific language, correct?

A. No.

Q. Item four says, "In that was in fact another person who robbed him on the night of the question [sic]." You never told the person that prepared the document those words?

A. No.

Q. So let me try to just get - - my last question to you just to try to understand what you are saying instead of what someone else put on the paper for you to sign. You just don't know or are not 100 percent sure that Lloyd Richardson was the person with the gun?

A. Yes, I'm not 100 percent sure.

Q. But you are sure that he was there?

A. Yes, I am sure.

14

Q.     And he was with the group of people who were - - who were at the scene?

A.     Yes.

On re-direct, defense counsel asked Mr. Duplechain if he was saying that the testimony he gave the jury was wrong. He stated that he was not saying it was wrong or right, he was just saying that he was not 100 percent sure "if he had the gun or not." When defense counsel asked Mr. Duplechain if he would give the same testimony if called before another jury, he replied, "No, I would not." He further said he would tell the jury that he was not sure who robbed him.

After discussions with counsel, the trial court struck paragraphs five and six of Mr. Duplechain's affidavit based on Mr. Duplechain's denial of those statements. The trial court took the matter under advisement and issued a per curiam opinion on November 24, 2015, denying the Motion for New Trial. The trial court's ruling stated the following, in pertinent part, (citations omitted):

> According to the Louisiana Supreme Court in *State v. Prudholm*, "recantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation since that disclaimer is tantamount to the admission of perjury so as to discredit the witness at a later trial." Additionally, in order to obtain a new trial based on newly discovered evidence, the defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant's lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty.

> In this case, the court finds the recantation made by the victim, Fletcher Duplechain, is highly suspicious being that it was made two years after the original trial and only after having contact initiated by the defendant's sister. Under cross-examination, Mr. Duplechain stated that he felt bad for the defendant after being told by the defendant's sister that the defendant had gotten beat up in jail. Mr. Duplechain also testified that he would not have completed the affidavit had the defendant's sister never contacted him. Moreover, Mr. Duplechain claimed that his memory at the time of the incident in

15

2013, wherein he identified the defendant as the perpetrator holding the gun, was better than it is now in 2015.

Furthermore, Mr. Duplechain stated that while he is currently unsure if the defendant was the person with the gun, he is sure that the defendant was present with the other individuals at the scene of the incident who robbed him. A Motion for New Trial shall only be granted upon the showing that injustice has been done. La. C.Cr.P. art. 851. According to the law on principals, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Applying the law on principals to this case, the court is not of the opinion that the guilty verdict would probably be changed if a new trial is granted because there is substantial evidence to find the defendant guilty as a principal. Under the law on principals, the defendant need not actually take anything to be found guilty of robbery nor need he have personally held a weapon to be guilty of armed robbery. Therefore, this court finds that injustice would not be served if the Motion for New Trial is not granted because the victim's recantation is highly suspicious and the defendant could still be considered guilty as a principal.

*Statutory Law and Jurisprudence*

In his Motion for New Trial, Defendant requested a new trial based on newly discovered evidence. Louisiana Code of Criminal Procedure Article 851(A)(B)(3) provides:

A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

. . . .

(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

16

The supreme court has stated the following about the standard of reviewing a motion for new trial based on newly discovered evidence, specifically recantation evidence:

> The burden is on the defendant to show that the new evidence was not discoverable prior to or during trial and that if the evidence had been introduced at trial, the new evidence probably would have caused the trier of fact to reach a different verdict.
>
> The trial judge is afforded considerable discretion in evaluating the impact of newly discovered evidence, and his denial of a motion for a new trial will not be disturbed on appeal absent a clear abuse of that discretion. In evaluating whether the newly discovered evidence warrants a new trial, the test to be employed is not simply whether another jury might bring a different verdict, but whether the new evidence is so material that it *ought* to produce a verdict different from that rendered at trial. Recantations of trial testimony should be looked upon with the utmost suspicion. We have held specifically that a motion for a new trial should not be granted on the basis of a recantation because it is tantamount to an admission of perjury which would destroy the credibility of the witness at a new trial. It is not an abuse of discretion on the part of the trial court to refuse to grant a motion urged on such a basis.

*State v. Clayton*, 427 So.2d 827, 832-33 (La.1982) (citations omitted). Further explaining the role of an appellate court in reviewing a trial court's ruling on a motion for new trial, the first circuit stated:

> In ruling on a motion for new trial pursuant to LSA-C.Cr.P. art. 851, the trial court can only consider the weight of the evidence, not its sufficiency, and sits as a thirteenth juror. In contrast, an appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases, since that determination rests solely within the discretion of the trier of fact. Appellate courts may review the grant or denial of a motion for new trial only for errors of law. *See* LSA – C.Cr.P. art. 858.

*State v. Todd*, 10-1591, p. 10 (La.App. 1 Cir. 5/6/11) (unpublished opinion) (citations omitted), *writ denied*, 11-1160 (La. 11/18/11), 75 So.3d 447.

17

*Defendant's Argument*

> *A. Mr. Duplechain's recantation that Defendant was his assailant is material and would have produced a different verdict in this case.*

In his brief, Defendant argues Mr. Duplechain's recantation was material and would have produced a different verdict in the case. He argues that without Mr. Duplechain's testimony, the State's evidence against him was circumstantial and speculative. Defendant asserts that "because the jury would have understandably been persuaded by the confidence that Mr. Duplechain claimed in his trial testimony, the new evidence from the hearing could have played a significant factor in the jury's determination of whether the State met its burden."

In its brief, the State asserts "the circumstances surrounding the victim's recantation were decidedly suspect and unbelievable." Additionally, the State contends Mr. Duplechain did not completely recant his trial testimony and agreed at the Motion for New Trial hearing that he was in a better position in 2013 to identify the robber than he was in 2015 at the time of the hearing.

We agree that Mr. Duplechain's identification of Defendant as the person who robbed him was very important to the State's case; however, Defendant fails to prove the recantation ought to produce a different result. Mr. Duplechain's in-court identification of Defendant as the person who robbed him was preceded by his identification of Defendant as the robber in a photo line-up done the same day as the robbery. As the State argues in brief, Mr. Duplechain admitted at the Motion for New Trial hearing that he was in a better position to identify the robber in 2013 than two years later at the Motion for New Trial hearing. Additionally, his identification of Defendant as the robber was corroborated by other evidence. He observed the robber get back into the vehicle using the rear, driver's side door.

18

Officer Bob observed someone sitting in the rear, driver's side passenger seat lean over to discard an object out of the passenger's side window. He then observed a person sitting in that same seat exit the vehicle and run. He apprehended the person who ran, whom he later learned was Defendant.

In his recantation, Mr. Duplechain did not testify at the Motion for New Trial hearing that someone other than Defendant robbed him. In fact, he testified at the Motion for New Trial hearing that Defendant was present at the armed robbery, but may not have been the one to hold a gun to his head.

Finally, as stated by the trial court, the circumstances surrounding the recantation were highly suspect. Mr. Duplechain admitted he would not have signed the affidavit if he had not been approached by Defendant's sister. There is no indication that he would have ever recanted had it not been for the contact initiated by Defendant's sister. Mr. Duplechain acknowledged that he felt bad for Defendant when Defendant's sister told him that Defendant had been beaten up in jail.

In *Clayton*, 427 So.2d at 833, the supreme court found the recanting witness's testimony was "simply unbelievable" because it was "directly contradictory to testimony which she had given twice before and which had been corroborated by another eyewitness." Similarly, in *State v. Davis*, 431 So.2d 117 (La.App. 3 Cir. 1983), this court found no abuse of discretion in the trial court's denial of a motion for new trial based on a recantation that was inconsistent with at least three prior consistent statements which had been corroborated by other witnesses.

In the present case, Mr. Duplechain's recantation was inconsistent with two prior identifications (photo line-up and in-court). As stated previously, both prior

19

identifications of Defendant were corroborated by Mr. Duplechain's description of where the robber re-entered the vehicle, Officer Bob's observations, and Officer Bob's eventual apprehension of Defendant when he fled.

In *State v. Sonnier*, 402 So.2d 650, 655 (La.1981), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3571 (1983), the supreme court upheld the trial court's denial of a motion for new trial, finding "the trial judge reasonably could have concluded that Eddie's recantation would not have created a reasonable doubt of guilt in the mind of any reasonable juror." The supreme court reasoned:

> If the recantation could have been introduced in evidence at trial along with Eddie's testimony casting most of the blame on his brother, it, of course, would have had some effect. However, in fairly assessing the effect, we must also hypothesize that the jury would have been aware that Eddie changed his story after being relieved of fear of the death penalty and that he had an opportunity to confer with Elmo about his testimony. Also, the jury had before it, not only Eddie's original testimony, but the confessions of both Eddie and Elmo which placed the smoking gun in Elmo's hands. Furthermore, Eddie's recantation did not totally exculpate Elmo from complicity in the crime of first degree murder. It confirmed that he was a willing participant in the events leading up to and following the actual killings. In view of the other evidence pointing to Elmo as the real instigator and executioner, we agree that Eddie's recantation probably would not have changed the verdict of guilty of first degree murder if it had been introduced.

*Id.*

Likewise, we find that if the jury were to hear Mr. Duplechain's recantation, it would have had some effect, but probably would not have changed the verdict. The jury would have heard Mr. Duplechain's recantation along with his photo line-up identification of Defendant as the robber and his positive in-court identification of Defendant as the robber. The jury would have also heard the corroborating evidence of Officer Bob and would have heard of the suspicious circumstances under which Mr. Duplechain signed the affidavit of his recantation.

Finally, "recantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation[.]" *State v. Prudholm*, 446 So.2d 729, 736 (La.1984). We find no special circumstances in the present case which suggest Mr. Duplechain's latest testimony is truthful. Accordingly, we find the trial court did not abuse its discretion in denying the Motion for New Trial.

> *B. The trial court erred by finding that the Defendant would have been found guilty as a principal to armed robbery, regardless of Mr. Duplechain's recanted testimony.*

Defendant contends that the trial court's second rationale for denying the Motion for New Trial was erroneous. The trial court reasoned that even if a new trial was granted and the jury heard Mr. Duplechain's recantation, the jury would probably still find Defendant guilty as a principal. Defendant argues that the other circumstantial evidence was not sufficient to prove he had the general intent to be part of the armed robbery of Mr. Duplechain. Defendant further contends he fled from the vehicle because he was a convicted felon and wanted to distance himself from the gun and because he was scared of being found liable for all of the crimes the other occupants had committed. We agree with the trial court that if the jury heard all of the evidence presented at the first trial and heard Mr. Duplechain's recantation, the jury would likely still conclude that Defendant was present and participated as a principal.

> *C. Mr. Duplechain's recantation was believable and not coerced.*

Defendant argues that the trial court gave unwarranted significance to the fact that his sister approached Mr. Duplechain about recanting his testimony. Considering the trial court's role as the "thirteenth juror" in evaluating the weight of the evidence involved in a motion for new trial and considering the suspect

21

circumstances surrounding Mr. Duplechain's recantation, we find that the trial court did not err in finding Mr. Duplechain's recantation suspicious. *Todd*, 10-1591 at p. 10.

### D.  The trial court should have also granted a new trial on the Felon in Possession of a Firearm charge.

Defendant also argues that if this court finds a new trial should be granted based on the above arguments, a new trial should be granted not only on Defendant's conviction for armed robbery, but also on his conviction for possession of a firearm by a convicted felon.  Since we find that the trial court did not abuse its discretion in denying Defendant's Motion for New Trial, we need not and do not address this claim.

## DISPOSITION

We affirm the trial court's denial of Defendant's Motion for New Trial.

**AFFIRMED.**